THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
OSCAR CURTIS *et al.*, Defendants-Appellants.

First District (2nd Division)    No. 62428

Opinion filed April 26, 1977.

James J. Doherty, Public Defender, of Chicago (James Reddy, Assistant Public Defender, of counsel), for appellant Oscar Curtis.

Gordon Berry, of State Appellate Defender's Office, for appellant Louis L. Cokes.

Bernard Carey, State's Attorney, of Chicago (Jeffrey C. Pattee, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Defendants, Oscar Curtis and Louis L. Cokes, were charged by indictment with the offenses of murder and attempt murder in violation of sections 9—1 and 8—4 of the Criminal Code of 1961 (Ill. Rev. Stat. 1971, ch. 38, pars. 9—1, 8—4). Upon a joint jury trial both were found guilty as charged and judgments were entered on the verdicts. Defendant Curtis

was sentenced to serve consecutive terms of confinement in the Illinois State Penitentiary of 75-90 years for the offense of murder and 15 years to life for the offense of attempt murder. Identical but concurrent prison terms were imposed upon defendant Cokes, to be served upon completion of other sentences currently pending and arising from prior convictions for unrelated offenses.

From entry of the judgments of conviction defendants appeal contending (1) that each was prejudiced by the State's failure to comply with certain pretrial discovery orders in a timely fashion; (2) that the trial court erred in admitting into evidence a firearm allegedly employed in commission of the crimes charged in the indictment; (3) that the trial court improperly limited the scope of defendants' cross-examination of certain witnesses; (4) that certain statements of the prosecution in closing argument were improper; and (5) that the sentences imposed must be made to conform to the Unified Code of Corrections. Ill. Rev. Stat. 1973, ch. 38, par. 1005—8—4(c).

A review of the evidence adduced in the case at bar reveals that during the late evening hours of October 14, 1973, Mona Richardson and Vivian Shepherd were brutally assaulted in Garfield Park, Chicago, Illinois. The assailants attempted to strangle Richardson and, by wielding a broken bottle, inflicted severe lacerations about her neck before she was able to flee. Later that evening, the body of Vivian Shepherd was discovered in some shrubbery near the scene of the assault. She had been shot in the head and two shards of broken glass were found embedded in her slashed throat.

According to Richardson, she and Shepherd had been in the vicinity of Garfield Park on the date in question from approximately 3 p.m. until the time of the occurrence. A considerable portion of this time was spent in a store located at 13th Street and Kedzie Avenue where they watched television until 8 or 9 p.m. when they left to walk to a restaurant. Enroute they met and conversed with various people, including defendant Oscar Curtis, and two individuals identified as "Rabbi" and "Ricos." Their conversation with the latter consumed approximately one-half hour.

Continuing toward the restaurant, Shepherd and Richardson again met defendant Curtis who was seated in the driver's seat of a vehicle parked in an alley in the vicinity of Kedzie Avenue and 16th Street. Curtis beckoned to Shepherd, she approached the vehicle and spoke to Curtis outside the presence of Mona Richardson. Shortly thereafter Richardson rejoined Shepherd and the women entered the rear seat of the vehicle. Defendant Louis L. Cokes occupied the automobile's front passenger seat.

The presence of the women having thus been secured, according to Richardson, to minimize the likelihood of being curbed by police, the group proceeded to a nearby house to permit Curtis to purchase an

unspecified quantity of marijuana. Curtis then drove to Douglas Park where he paused for a period of 5 to 10 minutes before proceeding to Garfield Park. Curtis parked the automobile in a lot near the park's field house.

Richardson testified that immediately thereafter, Curtis turned, trained a gun on the women and, remonstrating that "You bitches think you are all slick," Curtis accused them of being "spies" for an individual identified as Larry Williams. Richardson described the weapon as a revolver with a brown or black handle and a "silver-like" barrel. The State introduced into evidence, over defense objection, a .32-calibre revolver owned by Curtis and recovered from the room in which defendants were apprehended. This revolver bore a yellow and white handle. Richardson indicated that she was "not exactly sure" that this exhibit was the firearm used in commission of the assault but noted that the "barrel part" resembled the gun wielded by Curtis. She also testified that this exhibit "may or may not be" the revolver used to shoot Vivian Shepherd.

Upon being confronted with this accusation the women protested their innocence. Curtis responded, "You know what the hell I am talking about. Don't try to play crazy with me," and ordered Shepherd to remove her clothes. She refused and indicated that to comply would prove futile since, "You [Curtis], going to kill me anyhow."

Curtis then directed his attention toward Richardson, slapped her and ordered her to disrobe. She complied and removed her blouse. Richardson testified that at this point Shepherd asked permission to go to a bathroom located in the field house. Her request was granted but, at Curtis' insistence, was accompanied by Cokes who had armed himself with Curtis' weapon so as to insure Shepherd's return.

Upon their return, Curtis again seized the weapon, put it to Shepherd's head and pulled the trigger. The weapon apparently misfired and Shepherd was not injured. Curtis and Cokes conferred privately after which Curtis announced that he intended "to kill you all M_____F_____ ass."

According to Richardson, Curtis then "grabbed Vivian, shoved her out of the car by the collar, throwed her on the ground and shot her." Richardson was overcome and looked away. She too was then seized by Curtis, thrown from the vehicle and onto the ground where he attempted to strangle her. During this episode Richardson observed Cokes "stomping Vivian in the head." He thereafter left Shepherd for dead and assisted Curtis in the latter's struggle with Richardson.

To this end, he temporarily restrained Richardson while his accomplice sought a weapon. Curtis recovered a broken bottle, gave it to Cokes and thus armed Cokes attempted to cut the back of Richardson's neck. Richardson continued to resist, prompting Curtis to exclaim, "This bitch

won't die. Give me the M_____F_____ bottle. I am going to kill this little bitch before I leave out this park." Cokes attempted to pass the bottle to Curtis but Richardson intercepted it and threw it aside. As Curtis sought another weapon, Richardson freed herself and ran to a nearby service station. Police were summoned and Richardson was transported to hospital facilities.

While at the hospital an unspecified quantity of heroin contained in nine "packets" of unspecified dimensions or weight was found in her clothing. She was also interrogated by investigating officers of the Chicago Police Department and was shown a series of seven photographs from which she identified photographs of defendants as depicting her assailants.

Pursuant to this investigation defendants were arrested on October 15, 1973, as they slept together in a bedroom of Curtis' mother's home. A revolver was recovered from a table in the room in which defendants were apprehended. This firearm was subsequently introduced into evidence at defendants' trial.

Upon questioning by the arresting officers, Curtis indicated that he had purchased the revolver in the early evening of October 14, 1973, from an unidentified man for the sum of $50. While at the station house a pair of blue suede shoes were recovered from defendant Cokes after the arresting officers noticed unusual stains on the shoes. Police investigation of the area in which the body of Vivian Shepherd had been discovered led to the recovery of a portion of a broken bottle bearing blood stains. The shoes and bottle were placed in the custody of the Chicago Police Department Crime Laboratory ("Lab") for chemical and physical analysis.

At defendants' trial, Chicago Police Officer Vincent Lomorro of the Firearms Identification Unit testified that he had occasion to examine the revolver recovered from defendant Curtis' living quarters. A comparison of bullets test-fired from the revolver with the bullet recovered from the head of Vivian Shepherd revealed that the latter shell bore identical class characteristics to the test bullets. The comparison also indicated that the bullet found in the victim's head bore some individual characteristics of the test bullets. However, the mutilated condition of the bullet taken from the head of Shepherd precluded Officer Lomorro from making a conclusive determination that the mutilated bullet had been fired from Curtis' revolver.

Also during the course of trial proceedings, microanalyst Mary Ann Mohan testified with respect to the various laboratory tests performed upon the physical evidence related to the assault of Richardson and Shepherd. Blood samples taken from Richardson were found to be Type A; similar analysis of blood samples taken from Shepherd were found to

be Type B. Analysis of the stains observed upon defendant Coke's shoes revealed that the stains were of human blood containing Type A and Type B antigens. Identical results were obtained from chemical analysis performed upon the blood found on the ground and the several pieces of glass recovered from the area in which Shepherd's body was discovered. Hair fragments found on the pieces of glass were shown to bear properties similar to samples of hair taken from Vivian Shepherd. Examination of the properties of the glass found near the body of Shepherd in comparison with the particles of glass recovered from Shepherd's neck led Mohan to conclude that these shards were "once part of a single unit."

Dr. Epuil Choi testified that a post-mortem examination was performed upon the body of Vivian Shepherd. As a result of this examination Dr. Choi indicated that her death had been caused by a bullet wound through the temple which penetrated her brain, as well as by a deep laceration of her neck. Richardson revealed to the jury the scars of similar lacerations upon her neck.

Defendants did not testify in their own behalf. Defendant Cokes presented the testimony of David Daniels, an investigator employed by the Office of the Cook County Public Defender. He testified that he interviewed Mona Richardson on July 5, 1974, and that on this occasion she said that prior to the shooting Curtis accompanied Shepherd to the toilet.

Defendants initially contend that they were prejudiced by the State's failure to comply with certain pretrial discovery orders in a timely fashion. Specifically, defendants assert that they did not receive copies of Lab reports summarizing analyses performed upon the aforementioned blood samples and physical evidence until after the commencement of trial proceedings; that defendants were surprised by much of these results; that such results substantially corroborated certain aspects of Mona Richardson's testimony; and that the tardiness of the Lab report and the introduction of the broken bottle into evidence unfairly forced defendants into formulating a theory of defense during the course of the trial.

The State does not controvert the fact that the reports and evidence in question were within the scope of the pretrial discovery orders or the similarly undeniable fact that such orders were not complied with in timely fashion. The State, however, shirks its own responsibility for the delay, and lamely suggests that the Lab is an autonomous agency which must be deemed solely accountable for any tardiness with respect to the reports and that defendants themselves must bear responsibility for any resulting prejudice by failing to request a continuance. Examination of

the record indicates that such a request for continuance was made on behalf of defendant Cokes and denied by the trial court during the course of trial proceeding.

An examination of the record reveals that the articles in question were recovered and placed in the custody of the Lab on or about October 15, 1973, and that defendants were thereafter indicted on charges that they murdered Shepherd and attempted to murder Richardson by "stabbing [them] with a broken bottle." Defendants filed pretrial motions for discovery on December 11, 1973. Amended and supplementary motions for discovery were filed on March 15, 1974. It was not until July 8, 1974, that the prosecution informed defense counsel of its request to the Lab to perform certain tests upon the relevant physical evidence and that such report was pending. No express mention was made of the existence of the broken bottle or the analysis thereon.

Prior to trial, on the morning of July 10, 1974, defense counsel proceeded upon a motion to suppress as evidence the revolver and articles of clothing undergoing analysis. The delay in the preparation of the laboratory reports was again the subject of conversation. Counsel for Cokes observed, "We still don't have the laboratory report back. We expect it this afternoon according to the State's Attorney." Immediately upon the court's ruling on the merits of the motion to suppress, evidence was taken before the jury in connection with the State's case-in-chief. Defendants did not seek to delay the start of trial proceedings pending return of the laboratory reports. Presentation of the State's case continued into the afternoon of July 11, 1974, at which time the aforementioned laboratory reports were made available to counsel for the State and defendants.

■■ Supreme Court Rule 412(f)(g) provides a salutary means of insuring prompt and adequate disclosure to the accused of relevant material and information and places the burden of compliance squarely upon the prosecution. (Ill. Rev. Stat. 1973, ch. 110A, pars. 412(f) and (g).) This section provides:

\* \* \*

"(f) The State should ensure that a flow of information is maintained between the various investigative personnel and its office sufficient to place within its possession or control all material and information relevant to the accused and the offense charged.

(g) Upon defense counsel's request and designation of material or information which would be discoverable if in the possession or control of the State and which is in the possession or control of other governmental personnel, the State shall use diligent good faith efforts to cause such material to be made available to defense counsel; and if the State's efforts are unsuccessful and such material

> or other governmental personnel are subject to the jurisdiction of the court, the court shall issue suitable subpoenas or orders to cause such material to be made available to defense counsel."

These rules are deliberately silent as to those persons whose possession and control of material and information must be imputed to the prosecution. (See Ill. Ann. Stat., ch. 110A, par. 412, Committee Comments (Smith-Hurd 1974).) However, it cannot be doubted that the offices and personnel of the Chicago Police Department Crime Laboratory are investigative personnel within the meaning of these rules. While it is incumbent upon the prosecution to insure the prompt flow of material information to defense counsel from this source, either party may have obtained a *subpoena duces tecum* and thereby employed the entire panoply of judicial resources to spur the recalcitrant agency into completion of its analysis.

■■ However, there is no mandate that a court respond to failure to disclose evidence during discovery by excluding its use during the course of trial proceedings. (*People v. Pickett* (1976), 35 Ill. App. 3d 909, 342 N.E.2d 766.) The court may, in its discretion, order a continuance, mandate disclosure of these materials and permit their use at trial. The exercise of this discretion is not reversible absent a showing of prejudice or surprise. *People v. Jones* (1973), 13 Ill. App. 3d 684, 301 N.E.2d 85; *People v. Warren* (1975), 32 Ill. App. 3d 218, 336 N.E.2d 557.

■■ Where, as in the instant case, their indictments for murder and attempt murder charged that defendants assaulted their victims with a broken bottle and defense counsel was fully aware, prior to trial, that they did not possess all material information to which they were entitled under the rules of discovery and yet proceeded to trial, they may hardly be heard to complain of surprise as to the contents of such reports when eventually made available during the course of trial proceedings. See *People v. Embry* (1973), 12 Ill. App. 3d 332, 297 N.E.2d 604.

■■ Nor can it be maintained that defendants were improperly prejudiced by admission into evidence of the articles in question. Within this context, we note that at trial it was never questioned that Richardson and Shepherd were the victims of a particularly brutal assault. The sole issues were the circumstances surrounding the assault and the identity of its perpetrators. The evidence in question tended to corroborate Richardson as to the nature of the assault. The scars on her throat and the expert testimony of Dr. Choi regarding the Shepherd autopsy also bear excellent and unimpeachable witness to this matter. Hence, the admission into evidence of the broken bottle and the analysis thereon was, at best, cumulative.

The admission into evidence of testimony regarding the blood samples found to be compatible with the blood types of the victims may not be as

easily dismissed. Such evidence tends to connect defendant Cokes with the scene of the crimes. However, it appears that counsel for defendant Cokes was made aware, prior to trial, that the shoes bearing blood stains were seized and undergoing analysis. The results of the chemical analysis thereon have never been questioned.

■■ The meaning of such results are readily apparent and not so complex as to require months of intensive investigation to comprehend or dispute. Both defendants were expressly presented with the opportunity to fully cross-examine the State's witnesses as to the inferences to be derived from this analysis. Each was permitted to present argument to the jury tending to discount the obvious inferences to be gleaned from this evidence. Given the limited and clearly drawn viable issues at trial we are at a loss to explain how the tardy receipt of the results of the analysis would *per se* mandate reformulation of defendants' theory of defense. No prejudice was demonstrated in the record or alleged in defendants' briefs sufficient to require reversal of their convictions. See *People v. Jones*, 66 Ill. 2d 152, 361 N.E.2d 1104.

Defendants next contend that the trial court erred in admitting into evidence, over defense objection, a firearm allegedly used in commission of the crimes charged in the indictments.

■■■ A long and consistent line of decisions by Illinois courts has expressly rejected the notion suggested by defendants that the admissibility of a weapon into evidence turns upon the question of possession in any technical sense. Rather, such evidence is admissible where sufficient circumstances establish its connection to the defendant and the crime of which the defendant stands accused so as to render it probative upon a disputed fact of consequence to the determination of the litigation. See *People v. Jones* (1961), 22 Ill. 2d 592, 177 N.E.2d 112; *People v. Johnson* (1966), 35 Ill. 2d 516, 221 N.E.2d 497; *People v. Perkins* (1959), 17 Ill. 2d 493, 162 N.E.2d 385.

In the instant case, there is no question as to the relevancy of the weapon to defendants personally since it was recovered from defendants' living quarters incident to an arrest, the validity of which is unchallenged on appeal. Defendants contend, however, that the evidence adduced to establish the weapon's relevance to the crimes charged is insufficient to permit its introduction into evidence.

While the testimony of Mona Richardson regarding her identification of the weapon used in the assault is far from certain, her testimony did not preclude the firearm adduced at trial from being the murder weapon. Indeed, her testimony indicated that the State's exhibit was of the same class and bore a barrel resembling the murder weapon. Her major uncertainty was with respect to the identity of the firearm's manufacturer and the apparent coloration of the handle. She indicated that the handle

of the weapon wielded on the occasion of the assault was brown or black whereas the handle of Curtis' revolver was yellow and white.[1]

However, further evidence connecting the revolver to the crime was presented by expert ballistics testimony regarding the comparison of the bullet recovered from the skull of Vivian Shepherd and bullets test-fired from Curtis' revolver. While not conclusive, such testimony tended to establish the relevance of the recovered revolver in the case at bar. Ample evidence was introduced to lay the proper foundation for the introduction of the revolver into evidence at defendants' trial. Resolution of any disparities regarding the identification of the revolver properly remain within the province of the trier of fact.

Defendants next contend that the trial court improperly limited their cross-examination of Mona Richardson.

As to the first instance of alleged impropriety defendants assert that the trial court erred in precluding them from questioning Richardson as to the precise quantity of heroin recovered from her person subsequent to the assault and that this limitation so undermined their ability to attack Richardson's credibility as to deny defendants a fair trial.

It is a firmly established rule of law that mere arrests or indictments may not be used to impeach the credibility of a witness. (*People v. Smith* (1966), 74 Ill. App. 2d 458, 221 N.E.2d 68.) However, a witness may be cross-examined to establish that the testimony of the witness might be influenced by interest, bias or motive to testify falsely. (*People v. Vagil* (1973), 9 Ill. App. 3d 726, 292 N.E.2d 557.) In order to be admissible, evidence showing bias must be positive and direct—not remote and uncertain. *People v. Pickett* (1975), 34 Ill. App. 3d 590, 340 N.E.2d 259.

In the instant case, defendants were permitted to adduce that a quantity of heroin was recovered from Richardson's person subsequent to the assault; that she was charged with the offense of possession of heroin; and that subsequent to her identification of defendants as her assailants this charge was dismissed. Defendants were permitted to argue to the jury all reasonable inferences to be derived from this sequence of events. Hence, it must be concluded that defendants were accorded the opportunity to demonstrate Richardson's interest, bias or motive to testify falsely.

■■ Defendants' contention on appeal that they were erroneously precluded from adducing testimony as to the precise quantity of heroin recovered from Richardson's person is without consequence. Defendants sought to adduce only that "nine packets" of heroin were recovered. The

---

[1] Testimony of the arresting officer indicated that Curtis admitted ownership of the weapon recovered upon his arrest. The trial court, without defense objection, properly informed the jury in this regard pursuant to IPI Criminal No. 3.06. See also *People v. Mitchell* (1975), 27 Ill. App. 3d 117, 327 N.E.2d 158.

precise quantity of heroin involved does not appear of record, nor is the term "nine packets" self-determinative. Absent such information it would be impermissible to permit the jury to speculate as to the quantity of heroin recovered. No error was injected into the record by the trial court's ruling limiting the scope of defendants' cross-examination in these matters.

Within this context, defendants also contend that the court improperly precluded them from impeaching Richardson's testimony on the basis of a prior and allegedly inconsistent statement. During the cross-examination of Richardson by counsel for defendant Cokes the following exchange occurred: .

> "Q: Now this is a handgun, isn't it? It's a revolver?
>
> A: Right.
>
> Q: For a real gun is this kind of long or is this kind of short or is this kind of medium?
>
> A: I told you I don't know nothing about guns. It's small though."

Following this colloquy, defense counsel read the following portion of Richardson's testimony at a preliminary hearing:

> "Q: Mr. Gray: You don't know how long it [the revolver] was or how short it was?
>
> A: It was long for a real gun."

■■ The latitude allowed in cross-examination of a witness in a criminal proceeding rests in the trial court's sound discretion and only in the case of a clear abuse of that discretion resulting in manifest prejudice to defendant will a court of review interfere with that decision. (*People v. Pickett* (1975), 34 Ill. App. 3d 590, 340 N.E.2d 259.) A witness may be cross-examined as to prior inconsistent statements, but the inconsistency must be substantial and relate to a material and not a collateral or irrelevant matter. The test of whether a prior statement is sufficiently inconsistent to permit its utilization for impeachment purposes is that the inconsistent statement must have a reasonable tendency to discredit the direct testimony on a material matter. *People v. Hayes* (1975), 32 Ill. App. 3d 953, 337 N.E.2d 280.

■■ In the instant case, the allegedly impeaching matters are not substantially contradictory. Richardson's statement at the trial that the gun wielded against her was "small" does not deny her earlier statement that the revolver's length was "long for a real gun" as measured by some unspecified standard. Even if some minor inconsistency is to be suggested from this exchange, exclusion of the proffered impeaching testimony, in light of the other evidence adduced at trial, does not operate to defendants' manifest prejudice so as to mandate reversal of their convictions.

The next issue raised by defendants is that the State violated defendants'

fifth amendment right against self-incrimination and shifted the burden of proof by drawing attention to defendants' failure to take the stand as well as their failure to offer eye-witnesses to dispute the testimony of Mona Richardson.

That portion of the closing argument which defendants question reads as follows:

> "Mr. Benson: The only evidence you heard on that witness stand points to the absolute guilt of these two men. There has been not one shred of evidence that came from that witness stand that would in any manner whatsoever exonerate either of these two men for the horrible crime they committed last October. Not one shred of evidence.
>
> Mr. Nixon: Objection, your Honor.
>
> The Court: Overruled.
>
> Mr. Benson: And when you go into that jury room in about a half hour you're still not going to have heard one shred of evidence from an eyewitness from that witness stand on behalf of these two defendants—
>
> Mr. Queeney: Object, your Honor.
>
> The Court: You made your point, Mr. Benson. Proceed. Objection sustained."

■■ It is permissible for a prosecutor to comment on the uncontradicted nature of the State's case even in situations where the only person who could have effectively contradicted the State's evidence was the defendant himself. (*People v. Skorusa* (1973), 55 Ill. 2d 577, 304 N.E.2d 630.) While such forays into the realm of legal brinkmanship are always fraught with the danger of reversible error we feel that the remarks in question, considered within the context of the entire case, were neither impermissible within the teachings of *Skorusa* nor of sufficient gravity to mandate the reversal of defendants' convictions.

■■ Defendants finally contend that their sentences must be reduced so as to conform to the mandates of the Unified Code of Corrections. (Ill. Rev. Stat. 1973 Supp., ch. 38, par. 1005—8—4(c).) The relevant portion of this scheme provides as follows:

* * *

> "(c) The aggregate maximum of consecutive sentence shall not exceed twice the maximum term authorized under Section 5—8—1 for the most serious felony involved. The aggregate minimum period of consecutive sentences shall not exceed twice the lowest minimum term authorized under Section 5—8—1 for the most serious felony involved."

In the instant case, the trial court imposed upon defendants an aggregate minimum sentence of 90 years (*i.e.*, 75 years for the offense of murder and 15 years for the offense of attempt murder). Under

the aforementioned statute, the maximum aggregate minimum sentence to be imposed would be 28 years (*i.e.*, twice 14 years, the lowest minimum for the offense of murder, the most serious felony involved).

The State apparently concedes the applicability of this provision to the prosecutions initiated in the case at bar. (See *People v. Carpenter* (1976), 38 Ill. App. 3d 435, 347 N.E.2d 781.) However, the State correctly points out that automatic application of this provision to the consecutive sentences imposed in the instant case would produce the anomalous result of imposing a lesser aggregate minimum sentence than might have been imposed had the trial court, in the exercise of its discretion, ordered the sentences to be served concurrently.

Such a radical reduction of the sentences imposed by the trial court would serve only to frustrate his effort to impose a punishment commensurate with the egregious conduct of defendants. Since the trial court, having heard the evidence adduced at trial and having conducted a hearing in aggravation and mitigation, is the representative of the judicial system best qualified to sentence defendants, we vacate the sentences imposed in the instant case and remand the cause to the trial court for the trial court's further consideration and the imposition of sentences in accord with the relevant statutory provisions.

Accordingly, the judgment of the circuit court is affirmed, the sentences imposed thereon are vacated and the cause remanded for resentencing.

Judgment affirmed; sentences vacated and cause remanded.

DOWNING, P. J., and PERLIN, J., concur.