STATE OF CONNECTICUT *v.* DAVID R. RICHARDSON
(13740)

PETERS, C. J., SHEA, CALLAHAN, COVELLO and HULL, Js.

Argued February 7—decision released May 1, 1990

*B. Paul Kaplan,* with whom was *Michael J. Cartier,* for the appellant (defendant).

*Lawrence J. Tytla,* assistant state's attorney, with whom, on the brief, was *C. Robert Satti, Sr.,* state's attorney, for the appellee (state).

CALLAHAN, J. The defendant, David R. Richardson, was charged in an amended information with the crime of arson in the first degree in violation of General Statutes § 53a-111 (a) (1).[1] He was found guilty by a jury. The charge arose out of an incendiary fire that caused damage to the Tally-Ho Mall, a small business building located on route 2 in the town of Preston. The defendant was the manager of a furniture store called the Water Bedroom Store located in the west end of the mall. Although a corporation, the store was essentially a family-run business, all of its stock being owned

---

[1] General Statutes § 53a-111 (a) (1) provides in pertinent part: "ARSON IN THE FIRST DEGREE: CLASS A FELONY. (a) A person is guilty of arson in the first degree when, with intent to destroy or damage a building, as defined in section 53a-100, he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied . . . ."

by the defendant's wife, Laura Richardson, and the defendant's father, George Richardson. The fire occurred in the early morning hours of February 1, 1988, while another tenant of the mall, Jon Watts, was alleged by the state to have been asleep on a couch in a small office he rented at the east end of the mall.[2] There was evidence that the fire started in an attic area over the Water Bedroom Store. The attic could be reached by a trap door in the ceiling of the store.

The fire was discovered by a neighbor, Joyce Girard. From her porch, Girard noticed smoke coming from the mall at approximately 2:30 a.m.[3] After seeing the smoke, Girard awakened her husband and sent him to arouse Watts, whose truck was parked outside his office at the mall. She then called the fire department. Keith Girard was able to arouse Watts only after shouting and banging on the door and window of Watts' office for what he said was a period of four or five minutes. After arousing Watts, Girard assisted him in removing some computer equipment from the building.

## I

The defendant first claims that he is entitled to a new trial because the state, in its closing argument, having commented on facts not in evidence deprived him of his right to a fair trial and an impartial jury. The scenario that led to the defendant's claim can be summarized as follows. There was evidence that two or three months prior to February 1, 1988, the defendant had installed an autodialer on the telephone in the Water Bedroom Store. The autodialer was activated

---

[2] From this office Watts ran a part-time business called "Poor Boy Sounds'" that apparently supplied recorded music to bars and other places of entertainment in the area.

[3] Girard was on the porch at that hour to let the family cat, which had awakened her, out of the house.

when a beam emanating from any of three sensors in the store was broken. Once a beam was broken, a person authorized to be in the store, such as an employee, had a short interval to enter a code into a key pad signaling an authorized entry. The autodialer would then place a call to the defendant's answering service which in turn would notify the defendant of the authorized entry. If the code was not entered, the autodialer would, according to the evidence, dial the defendant's answering service, which in turn would contact the defendant via his pager to notify him of an unauthorized entry into the store.

On the morning of the fire, the autodialer placed six calls to the defendant's answering service in a short period of time, commencing at 2:25 a.m. and ceasing at 2:37 a.m.[4] The defendant was notified of the calls through his pager. The telephone company maintained a record of these calls because a telephone call from Preston, where the defendant's store was located, to the defendant's answering service in Putnam, was a toll call. The bill for these calls showing the calling number, the number called, and the time that the calls were made, was submitted into evidence at the trial by the defendant. There was no definitive evidence presented at the trial, however, as to exactly how the autodialer functioned.[5] In particular, no explicit testimony was offered concerning whether the autodialer dialed the defendant's answering service only once when a sen-

---

[4] There was another call placed at 7:16 a.m. that apparently has no relevance.

[5] Laura Richardson, the defendant's wife, in response to the question by defense counsel, "And if the beams are tripped, the autodialer makes *a* call?" responded, "Correct." (Emphasis added.)

The defendant, however, told the police that "when the door opens, a signal *starts* to dial the telephone." (Emphasis added.) Laura Richardson, also in response to a question, detailed the people who knew how to turn *off* the alarm system.

sor beam was broken or whether a single unauthorized intrusion into a sensor beam caused the autodialer to call continuously for a period of time or until reset. The evidence was uncontroverted, however, that although the defendant had been at his Preston store earlier in the evening he was not at the store when the fire was discovered or when the calls were placed by the autodialer.[6]

In his closing argument, in rebuttal of the defendant's final argument, the prosecutor expressed his belief to the jury that the autodialer, once activated by a single breach of a sensor beam, continued dialing. At the close of arguments, the defendant alerted the trial court to the absence of any evidentiary foundation for the state's remarks and requested a specific curative instruction pointing out to the jury the lack of a basis in the evidence supporting the state's argument. The trial court denied the defendant's request for such an instruction. Prior thereto the court reflected that it was its impression that the defendant himself had argued "some things" that were not in evidence. The court noted, however, that the jurors would be instructed that they were to make up their own minds from what they recalled the evidence to be and not from what either counsel said in argument. The defendant took an exception to the court's ruling. Thereafter, the court instructed the jury that its determination of the facts was to be adduced from the evidence and not the argu-

---

[6] The information concerning the defendant's whereabouts at 2:25 a.m. was conflicting. One version came from the defendant's statement to the police that he was in his other Water Bedroom Store in Danielson at that time and from his wife, who testified that she talked to the defendant on the telephone in the Danielson store at that time. There was testimony from a state police officer, however, who said that he saw a van similar to the defendant's some two or three miles from the mall at approximately 2:20 a.m. and that he followed it for several minutes in a direction taking it away from the mall.

ments of counsel.[7] Subsequently, no objection was voiced or exception taken by either the state or the defendant to the trial court's charge. "[I]n the absence of a fair indication to the contrary, [the jury] is presumed to have followed the instructions of the court." *State* v. *Glenn,* 194 Conn. 483, 497, 481 A.2d 741 (1984); *State* v. *Washington,* 182 Conn. 419, 429, 438 A.2d 1144 (1980); *State* v. *Barber,* 173 Conn. 153, 156–57, 376 A.2d 1108 (1977).

After the defendant's conviction, he moved for a new trial. The trial court denied his motion. On appeal, the defendant claims that the trial court erred when it denied his motion and that he is entitled to a new trial because of the failure of the court to deliver a specific curative instruction explicitly calling the jury's attention to the lack of an evidentiary foundation for the state's remarks pertaining to the operation of the autodialer. He argues that the misstatement of the evidence by the prosecutor resulted in catastrophic damage to his defense because it destroyed his attempt to cast suspicion on Watts as the perpetrator of the arson. He contends that if the jury had determined that the autodialer required a separate intrusion each time that it dialed, it may have believed that Watts was in the Water Bedroom Store setting the fire during the period of time that he could not be aroused by Keith Girard.[8] The defendant postulates that if he could have generated suspicion concerning Watts' activities between

---

[7] The state in its closing argument also initially informed the jury that what it was going to say by way of argument was not evidence and that it was for the jury to decide what the facts were.

[8] Girard's precise response on cross-examination to the question of how long it had taken to arouse Watts was: "I would say four to five minutes. I don't know." To which defense counsel responded, "You don't know. All right. Now, when the fire department came you were told not to go inside?" This appears to be the extent of the defendant's exploration at trial of the length of time it took to arouse Watts.

2:25 a.m. when the first call was dialed and 2:37 a.m. when the last call was dialed, it may have created a reasonable doubt concerning his own culpability for the fire. He argues that the state's remarks, without a specific curative instruction, detracted from his attempt to implicate Watts to the extent that he was deprived of due process and that he is entitled to a new trial. We disagree.

A thorough review of the transcript reveals that the modus operandi of the autodialer, the subject of the state's disputed argument, has taken on an importance on appeal that it does not appear to have had at trial. It is only on appeal that the propensities of the autodialer have attained their status as the crucial element of the defendant's case.[9] Whether the autodialer dialed only once when activated or continued to dial once activated was not a central issue at trial. In fact, as is evidenced by this appeal, that particular aspect of the operation of the autodialer was never the subject, at trial, of an explanation by witnesses for either the state or the defendant.

Further, the prosecutor's remarks do not appear to interfere appreciably with the defendant's attempt to point the finger of suspicion at Watts. As disclosed by the evidence, Watts was alone in the mall at 2:25 a.m. when the autodialer went into operation and the defendant was elsewhere. That fact, coupled with Girard's testimony that he could not awaken Watts for four or five minutes, would seem adequate to have

---

[9] The defendant filed a motion for a new trial on May 8, 1989, within one week after his conviction, that did not cite the state's argument as grounds. In his motion at that time the defendant cited only an unconstitutional search and newly discovered evidence as reasons for a new trial. When the motion was argued on June 23, 1989, however, the defendant did, at that time, contend that the state's argument entitled him to a new trial. He also included that reason in his preliminary statement of issues dated July 21, 1989.

made the defendant's point, if the point was to be made, that Watts might have been the culprit. Apparently, from the cumulative effect of the other evidence at trial, the jury did not adopt the defendant's theory.

Further, David Mason, the chief of the Poquetanuck Volunteer Fire Department, who was the first firefighter to arrive at the mall, testified that he received the alarm at 2:32 a.m. and arrived at the scene four minutes later at 2:36 a.m. He testified that at the time he arrived he saw Watts and Keith Girard standing outside. The last relevant call by the autodialer, however, was made at 2:37 a.m., which casts doubt on the defendant's theory concerning Watts' responsibility if the autodialer required a separate intervention by a person each time that it dialed.

Moreover, while the defendant claims that there was no evidence that would allow the state to argue as it did, he neglects to note that, in his final argument, he stated concerning the Water Bedroom Store, "we know that at 2:37 somebody was in there." That argument assumes that the autodialer required continuous intervention *by a person* in order to operate as it did. There was, however, no evidence for that proposition before the jury any more than there was evidence that the autodialer continued to dial after only one intrusion as argued by the state.[10]

" 'In determining whether the defendant was denied a fair trial we must view the prosecutor's comments

---

[10] In his final argument, defense counsel in an effort to explain why the defendant did not call the police when his pager sounded six times at 2:30 a.m. said, "He never had any indication there was a burglary, he never had any indication it was a fire, he never had any indication he should get excited about that. The only indication was in the past animals might trip this up and they had some, whether you call them false alarms or alarms that turned out not to be a person inside there."

Further, in a statement, the defendant stated that he did not call the police because he "had many false alarms in the past."

in the context of the entire trial. *State* v. *Kinsey,* 173 Conn. 344, 348–49, 377 A.2d 1095 (1977).' *State* v. *Haskins,* 188 Conn. 432, 457, 450 A.2d 828 (1982)." *State* v. *Williams,* 204 Conn. 523, 538, 529 A.2d 653 (1987); *State* v. *Glenn,* supra, 492. In that context the burden is on the defendant to prove that the remarks made by the prosecutor were so prejudicial that he "was deprived of the opportunity for a fair trial and [that] the entire proceedings were tainted." *State* v. *Hawthorne,* 176 Conn. 367, 372, 407 A.2d 1001 (1978); *State* v. *Doehrer,* 200 Conn. 642, 653–54, 513 A.2d 58 (1986); *State* v. *Glenn,* supra; *State* v. *Hafner,* 168 Conn. 230, 251, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975); *State* v. *Hamel,* 14 Conn. App. 6, 9, 539 A.2d 603 (1988). Further, in addressing the jury " '[c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument.' *State* v. *Laudano,* 74 Conn. 638, 646, 51 A. 860 (1902); see *State* v. *Greenberg,* 92 Conn. 657, 663, 103 A. 897 (1918)." *State* v. *Ubaldi,* 190 Conn. 559, 575, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983).

Although the prosecutor may have commented on facts not in evidence, we cannot say that his remarks were completely uninvited by the defendant's closing argument. See *State* v. *Fullwood,* 194 Conn. 573, 585, 484 A.2d 435 (1984); *State* v. *Falcone,* 191 Conn. 12, 23, 463 A.2d 558 (1983). The question before us, however, is not whether the prosecutor's remarks " ' "were proper or improper, but it is whether the action of the trial court in refusing to grant a new trial on account of them, in the exercise of its discretion, so far exceeded or abused the discretion committed to it in a matter of this kind as to warrant us in granting a new trial."

*State* v. *Laudano*, [supra, 646].' *State* v. *Couture*, 194 Conn. 530, 562, 482 A.2d 300 (1984) [cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985)]." *State* v. *Fullwood*, supra, 584. "The trial court is in a better position to determine the propriety of the remarks of counsel and whether or not they are harmful." *State* v. *Glenn*, supra, 493. Because this case does not involve "deliberate prosecutorial disregard of express judicial directions or established rules of fair play," there is no occasion for the exercise of our supervisory powers. *State* v. *Fullwood*, supra. Our inquiry rather is to determine whether the defendant was deprived, by the remarks of the state, of his constitutional right to a fair trial. Id., 584–85; *State* v. *Glenn*, supra, 492; *State* v. *Kinsey*, supra, 348.

" '[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.' *Smith* v. *Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); *State* v. *Cosgrove*, 186 Conn. 476, 489, 442 A.2d 1320 (1982)." *State* v. *Couture*, supra, 562; *State* v. *Palmer*, 196 Conn. 157, 163, 491 A.2d 1075 (1985). We must, therefore, determine whether the remarks of the prosecutor, in light of all the circumstances, including the trial court's charge, were so egregious and so damaging to the defendant that they deprived him of a fair trial. *State* v. *Fullwood*, supra; *State* v. *Couture*, supra, 562–63. Applying the established rules to the case before us, we conclude that the defendant falls far short of demonstrating an entitlement to a new trial. See *State* v. *Doehrer*, supra, 653. Even if it is assumed that the prosecutor's comments concerning the autodialer were without foundation, the defendant's attempt to inculpate Watts was not so substantially impaired thereby as to deprive him of a fair trial. The court did not err therefore when, in the exer-

cise of its discretion, it denied the defendant's motion for a new trial. *State* v. *Fullwood,* supra, 584; *State* v. *Laudano,* supra, 646.

## II

The defendant next claims that the trial court committed reversible error when it denied him the opportunity to impeach Watts after Watts had testified in the state's case-in-chief. On direct examination by the prosecutor Watts testified that he had been sleeping on a couch in his office in the mall at the time the fire was discovered. He stated that he had arrived at the mall about midnight after having seen "some club owners and managers" in connection with his business. After reaching the mall, he testified that he had done some paper work and some work with his computer. Watts stated that, because it was so late, he then decided to stay overnight in his office rather than return home inasmuch as the mall was more convenient to his day job.[11]

On cross-examination Watts admitted that prior to arriving at the mall he had been at places that serve liquor and that he had consumed a few beers. He denied, however, that he had been intoxicated. Watts also denied that he had ever told anyone that he was intoxicated on the morning of the fire or that his decision to stay overnight in his office had anything to do with his inability to drive because of his ingestion of alcohol. Further, he stated that he did not believe alcohol was affecting him at all on the morning of the fire.

Thereafter, during his case-in-chief, the defendant called Paul Weady as a witness in an effort to impeach Watts by the use of a prior inconsistent statement. Weady was a private investigator who had been

---

[11] At that time Watts worked days at the Indian reservation in Ledyard.

retained by the defendant. In an offer of proof outside the presence of the jury, Weady testified that he had spoken to Watts on May 3, 1988, and that at that time Watts had told him that "he had been in the Plainfield-Jewett City area of booking for D.J. jobs, and he stopped at Matthews restaurant, which may have been Mad Jacks at that time. He had a few beers there. He went to the Tally-Ho Mall where his office was to do some work. And when I asked him why he stayed there that evening, he said the reason he stayed there is he had been drinking and he did not want to take a chance on driving at that time."

The state objected to the admission of Weady's testimony and the trial court sustained the objection, ruling that Watts' statement was not inconsistent with his testimony. The defendant excepted to the trial court's ruling and on appeal claims that it constitutes reversible error. We disagree.

Impeachment of a witness by the use of a prior inconsistent statement is proper only if the two statements are in fact inconsistent. *United States* v. *Hale,* 422 U.S. 171, 176, 95 S. Ct. 2133, 45 L. Ed. 2d 99 (1975); *Grunewald* v. *United States,* 353 U.S. 391, 418, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957); *State* v. *Piskorski,* 177 Conn. 677, 710, 419 A.2d 866, cert. denied, 444 U.S. 935, 100 S. Ct. 283, 62 L. Ed. 2d 194 (1979); *Schurgast* v. *Schumann,* 156 Conn. 471, 482, 242 A.2d 695 (1968). Moreover, the inconsistency must be *substantial* and relate to a *material matter. Patrick* v. *Burns,* 5 Conn. App. 663, 675–76, 502 A.2d 432 (1985), cert. denied, 198 Conn. 805, 504 A.2d 1059 (1986). "Since the purpose of such evidence is 'to induce the tribunal to discard the one statement because the witness has also made another statement which cannot at the same time be true'; 3A Wigmore, [Evidence (Chadbourn Rev. 1970) § 1040]; the inconsistency must be substantial and

relate to a material matter. *People* v. *Curtis,* 48 Ill. App. 3d 375, 386, 362 N.E.2d 1319 [1977]; 98 C.J.S., Witnesses § 583. In determining whether an inconsistency actually exists, the testimony of the witness as a whole, or the whole impression or effect of what has been said, must be examined. *State* v. *Hephner,* 161 N.W.2d 714, 719 (Iowa [1968]); *Commonwealth* v. *West,* 312 Mass. 438, 440, 45 N.E.2d 260 [1942]; *State* v. *Bowen,* 247 Mo. 584, 598, 153 S.W. 1033 [1913]; 3A Wigmore, op. cit.; 98 C.J.S., Witnesses, supra. Moreover, statements from which a possible inference of inconsistency may be drawn are insufficient for the purpose of impeachment. *Gilmartin* v. *D. & N. Transportation Co.,* 123 Conn. 127, 134–35, 193 A. 726 [1937]; 98 C.J.S., Witnesses, supra." *State* v. *Piskorski,* supra, 710.

The trial court is vested with wide discretion as to what may be admitted as a prior inconsistent statement for impeachment purposes. *State* v. *Torres,* 210 Conn. 631, 640, 556 A.2d 1013 (1989); *State* v. *Avis,* 209 Conn. 290, 302, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989); *State* v. *Reed,* 174 Conn. 287, 303, 386 A.2d 243 (1978). That discretion will not be disturbed unless it has been abused. *Patrick* v. *Burns,* supra, 676. In view of all the circumstances, we conclude that the court could reasonably have decided that Watts' statement, sought to be introduced through Weady, was not substantially inconsistent with his testimony or did not sufficiently relate to a material matter so as to warrant its admission into evidence. *State* v. *Piskorski,* supra, 711; *Patrick* v. *Burns,* supra, 676. The trial court did not abuse its discretion in so ruling.

There is no error.

In this opinion the other justices concurred.