## STATE OF CONNECTICUT *v.* MANUEL ABREU
## (AC 15536)

Dupont, C. J., and Foti and Freedman, Js.

Argued March 5—officially released July 22, 1997

*John Serrano*, for the appellant (defendant).

*Leon F. Dalbec, Jr.*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's

attorney, and *George Ferko*, assistant state's attorney, for the appellee (state).

*Opinion*

FREEDMAN, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit sexual assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-70 (a) (1),[1] sexual assault in the third degree in violation of General Statutes § 53a-72a (a) (1) (A),[2] and two counts of risk of injury to a child in violation of General Statutes § 53-21.[3] On appeal, the defendant claims that the trial court improperly (1) precluded him from contending, during closing argument, that the victim's testimony on the issue of penetration was substantially and materially inconsistent with a prior statement made by the victim, and (2) prohibited him from introducing testimony from the victim's foster mother concerning the events leading

[1] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

General Statutes (Rev. to 1993) § 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

[2] General Statutes § 53a-72a (a) provides in relevant part: "A person is guilty of sexual assault in the third degree when such person (1) compels another person to submit to sexual contact (A) by the use of force against such other person or a third person . . . ."

[3] General Statutes (Rev. to 1993) § 53-21 provides: "Any person who wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that its life or limb is endangered, or its health is likely to be injured, or its morals likely to be impaired, or does any act likely to impair the health or morals of any such child, shall be fined not more than five hundred dollars or imprisoned not more than ten years or both."

up to the day the victim ran away from her foster home. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In late fall, 1994, the fifteen year old victim resided with her foster mother, Publia Gonzalez, and two other foster children in a two-story condominium in Hartford. The defendant, who was Gonzalez' boyfriend at the time, would sometimes come to the condominium. In September or October of 1994, when the victim was in the kitchen of the condominium, the defendant intentionally and inappropriately touched her buttocks. After the defendant touched her, the victim turned around to ask the defendant what he was doing, and he told her to be quiet.

On a subsequent occasion, the defendant came to the condominium in an intoxicated state. He proceeded to rub his penis through his pants, while occasionally looking at the victim. This lasted for approximately twenty minutes. Gonzalez' niece, Glenda Robles, was present on that occasion. When Robles indicated that she had to leave, the victim indicated that she was afraid, and Robles took the victim home with her.[4]

A few weeks later, the victim was upstairs reading in her bedroom. The defendant came into the room, knelt down on his knees, pulled the victim's pants down,[5] and tried to put his penis into her vagina. The defendant's erect penis was exposed. The victim tried to keep her knees closed while that was occurring.

---

[4] With regard to that incident, as well as the previous incident that occurred in the kitchen, the trial court charged the jury that it could not find the defendant guilty of the crimes charged on the basis of the evidence of those incidents. The court charged that the evidence was being admitted to show the defendant's general intent, any motive the defendant may have had and whether the defendant's conduct evinced a pattern of criminal activity.

[5] The victim testified that the defendant was unable to pull her pants all the way down because she was struggling, but he did get them down "far enough to expose [her] private areas."

Although the victim could feel the defendant's penis touch her, the defendant was unable to penetrate her. During that incident, the victim, who was scared and crying, yelled at the defendant to get off of her. The defendant told the victim to "shut up" and that if she told anyone what had happened, she would not be believed. He stated, "I don't know why you're going to waste your time," and then left the room.

In early November, 1994, the victim was sitting on the floor in the living room of the condominium watching television when the defendant sat down on the couch behind her. The defendant grabbed the victim's right hand and pulled it behind her to where he was sitting. The victim then felt the defendant's penis in her hand. The defendant made the victim move her hand up and down as she held his penis, and the defendant briefly touched the victim's breasts over her clothing. The defendant then pulled the victim's hair, causing her pain. The victim did not struggle to get away from the defendant because she was afraid that if she did the defendant would pull her hair harder. The defendant told the victim, "If you tell anyone, nobody is going to believe you." He also told the victim, "If you tell anyone, you're going to see what's going to happen." Following that incident, the victim ran away from her foster mother's home because she was afraid of the defendant.

I

The defendant first argues that the trial court improperly prohibited him from arguing, during closing argument, that the victim's testimony on the issue of penetration was materially inconsistent with a prior statement made by the victim. The defendant further argues that by so ruling, the trial court infringed on his federal and state constitutional rights.

Some additional facts are necessary to resolve this issue. On direct examination, the victim testified that

the defendant did not penetrate her during the attempted sexual assault in her bedroom. On cross-examination, defense counsel questioned the victim about what she had told various workers from the department of children and families (DCF) about that incident. Specifically, in response to a question by defense counsel, the victim responded that she did not recall having told any of the people from DCF that the defendant had been successful in having sex with her. On redirect examination, the victim again stated that she did not recall ever telling anyone that the defendant had penetrated her. Finally, on recross-examination, the victim stated that she never told anyone that the defendant had penetrated her.

The state also presented the testimony of Donna Davies, a DCF investigator who interviewed the victim on December 12, 1994. On direct examination, Davies testified that during that interview, she questioned the victim about the incident with the defendant in the victim's bedroom. With regard to that incident, Davies testified that "[the victim] did not specifically state that she was penetrated." Davies reiterated that when questioned on cross-examination.[6] Finally, Davies again indi-

---

[6] The transcript reveals the following:

"Q. The incident that you described that [the victim] explained to you that she said occurred in the bedroom, do you recall that she indicated to you that [the defendant] tried to penetrate her or that he did penetrate her?

"A. What she indicated in her statement to me was that he had tried to put it in a couple of times. She did not clearly state to me that she was penetrated."

When asked to check her notes of the interview, Davies stated: "You're talking about the paragraph on page two, which I'm reading right now. What she stated and what my notes state is that he pushed his penis into her a few times. That does not—I am not indicating that it was into her vagina. She indicated to me that she was trying to hold her pants on, that she was trying to keep her legs together, and that he was pushing into her. Now, I did not use anatomical drawings or dolls to clarify exactly what she meant as far as how far his penis went. I do know that her pants were down, that his pants were down, and his penis was out, from her description to me."

cated on re-direct examination that the victim never explicitly or specifically mentioned that the defendant had penetrated her vagina. Davies stated, however, that she did not ask the victim those types of questions.

After the state rested, the defense presented the testimony of Kim Clarke, a social work supervisor for DCF. Clarke, along with social worker Leroy Muldrow, interviewed the victim after the victim reported to Muldrow that she had been sexually abused in her foster home. With regard to the incident in the victim's bedroom, Clarke testified that her conclusion after interviewing the victim was that the defendant had penetrated the victim.[7] On cross-examination, however, Clarke admitted that her notes of the interview with the victim were of her interpretation of what the victim had said, and that the victim never said that the defendant had penetrated her.[8]

---

[7] The transcript reveals the following:

"Q. In regard to the bedroom incident, did she indicate whether or not [the defendant] actually penetrated her?

"A. Based on what I recall, it sounded like he did penetrate her, based on what I recall. Her words were that he inserted his penis into her a couple of times. And I interpret that to mean penetrate. She didn't use the word 'penetrate.' "

[8] The transcript reveals the following:

"Q. Okay. And when you interviewed [the victim] on December 5, you indicated that—I believe your words were that you were interpreting what she had said. That was your interpretation of what she had said?

"A. Correct. We have a criteria for basically different types of sexual abuse and they fit in a couple of different categories. And, based on her words, yes, I interpreted. I guess you could call it that.

"Q. So when you were doing your report, it was more or less a summary of what she had said.

"A. I tried to be as specific as possible, as specific as what I had on my scrap piece of paper.

"Q. Okay. And based on . . .

"A. But I did some summarizing.

"Q. Based on your notes and what you recall from the interview, that's how you were filling out your report.

"A. Yes.

\* \* \*

Following a charging conference, the trial court, on the record, indicated that it would allow the defendant to argue during closing argument a number of "alleged inconsistencies" between the victim's trial testimony and statements that she made to others. The trial court, however, disallowed defense counsel from arguing that the victim's statements were inconsistent with regard to whether the defendant had penetrated her during the incident in the victim's bedroom. In so ruling, the court first reviewed the testimony of Clarke, and noted that her testimony was of *her* interpretation of the victim's statements. The court stated that "[i]nterpretations by a listener do not constitute the declaration of an inconsistency." The court further stated that evidence of any inconsistency was lacking and that to

---

"Q. I think you also said—did she actually use the word 'inserted into'? Do you remember her using those exact words or was it 'pushed into' or 'into'?

"A. I thought it was 'put into.'

"Q. 'Put into'?

"A. Yes. I think that was what she used.

"Q. And based on that, did you interpret that to mean penetration?

"A. Yes.

"Q. Okay. Have you ever used the expression that you bumped into someone in the morning? I bumped into Leroy this morning?

"A. Yes.

"Q. Do you mean penetration—when you used that expression, did you mean penetration?

"A. Bumped into? No.

"Q. Okay. And if I were to take my pencil and push it into the side of the desk, does that mean I'm penetrating the desk?

"A. No.

\* \* \*

"Q. Okay. And I believe you did testify earlier that what she told you was that he attempted to have sexual intercourse with her. Do you remember that?

"A. Yes. Those were her words.

\* \* \*

"Q. Okay. And I believe you also testified that it sounded like he—from your—based on your conversation, it sounded like he penetrated her, but she never used the word 'penetration,' did she?

"A. No, she did not."

allow the defendant to argue such an inconsistency would be to ask the jury to speculate.[9]

The defendant argues that the trial court impermissibly invaded the province of the jury when it concluded that the victim had not told Clarke that the defendant had penetrated her. The state counters by claiming that the defendant failed to demonstrate that the victim's trial testimony and the prior statement to Clarke were substantially and materially inconsistent. The state further argues that because the defendant failed to demonstrate that the victim's statements were inconsistent on the issue of penetration, the court exercised proper discretion in prohibiting closing argument on this issue. We agree with the state.

## A

We first consider whether the trial court correctly concluded that victim's trial testimony was not substantially and materially inconsistent with the prior statement that she made to Clarke. We begin by noting that "[w]hile it is clearly proper to attack a witness' credibil-

---

[9] The trial court stated: "Kim Clarke, in response to [defense counsel's] questions later conceded that [the victim] had never used the words that he inserted his penis into her. But, she somewhat recalled again, not with a great deal of certainty, that [the victim] may have said 'put into.' Now, the next question that the court raises, but these questions were not asked as a follow-up by either side: Put into what? The sexual assault statute defines sexual intercourse as penetration into the vaginal, to the vagina, into the genital area, and also into the anal opening or the genital opening, I'm sorry. So that there are three vaults by which penetration may occur which constitutes sexual intercourse. We have none of that here.

"The court concludes that in this instance, Kim Clarke made an inaccurate and incorrect leap of faith. In addition, the victim testified that she is still a virgin. She found no blood on the bed after the alleged incident. The victim herself testified that there was no penetration. The court concludes that the evidence of any inconsistency is lacking. And to argue inconsistency would be to ask the jury to speculate, at best. The evidence further indicates that the clearest statement that Kim Clarke made on cross-examination was, and I quote 'I thought'—she's not even certain—'I thought she said put into.' Again, the court raises the question: Put into what? The genital area?"

ity by evidence of his materially inconsistent statements . . . this can only be done if the court is satisfied that the prior statements are in fact inconsistent. . . . In determining whether an inconsistency actually exists, the testimony of the witness as a whole, or the whole impression or effect of what has been said, must be examined." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 220 Conn. 385, 395, 599 A.2d 1053 (1991). Moreover, "[s]ince the purpose of such evidence is to induce the tribunal to discard the one statement because the witness has also made another statement which cannot at the same time be true . . . the inconsistency must be substantial and relate to a material matter." (Citation omitted; internal quotation marks omitted.) *State* v. *Richardson*, 214 Conn. 752, 763–64, 574 A.2d 182 (1990). "[S]tatements from which a possible inference of inconsistency may be drawn are insufficient for the purpose of impeachment." Id., 764.

We agree with the conclusion of the trial court that the victim's prior statement to Clarke was not substantially and materially inconsistent with the victim's testimony at trial. In both the statement to Clarke and her testimony at trial, the victim described how the defendant "attempted" to have sexual intercourse with her. The victim testified at trial that she never told anyone that the defendant had penetrated her and Clarke testified that the victim never used the word "penetration." Although Clarke interpreted the victim's statement to mean that the defendant had penetrated the victim, the trial court correctly noted that Clarke's interpretation does not constitute a substantial or material inconsistent statement of the victim.

B

Having concluded that the victim's trial testimony was not substantially and materially inconsistent with

the prior statement given to Clarke, we next consider whether the trial court, in not allowing the defendant to argue such an inconsistency to the jury during closing argument, impermissibly invaded the province of the jury.

We begin by noting that "[c]ounsel may comment upon facts properly in evidence and upon *reasonable* inferences to be drawn from them. . . . Counsel may not, however, comment on or suggest an inference from facts not in evidence. . . . Even if the trial court admits incompetent evidence, it may be relied on in argument, and alone or in part may support a verdict or finding." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Arline*, 223 Conn. 52, 58–59, 612 A.2d 755 (1992).

"In general, the scope of final argument lies within the sound discretion of the court . . . subject to appropriate constitutional limitations. . . . It is within the discretion of the trial court to limit the scope of final argument to prevent comment on facts that are not properly in evidence, *to prevent the jury from considering matters in the realm of speculation* and to prevent the jury from being influenced by improper matter that might prejudice its deliberations." (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 59–60.

In the present case, after the trial court concluded that the victim's trial testimony was not inconsistent with the prior statement that she made to Clarke, it properly exercised its discretion in prohibiting closing argument on this issue. If the trial court had allowed the jury to consider such an inconsistency, the jury then would have been allowed to consider matters within the realm of speculation. The trial court therefore properly prevented defense counsel from arguing this matter to the jury.

## II

The defendant next argues that the trial court improperly refused to admit testimony by the victim's foster mother, Gonzalez, concerning events leading up to a confrontation between the victim and Gonzalez on the day the victim ran away. The defendant argues that this ruling by the trial court infringed on his federal and state constitutional rights to confront witnesses and to present a defense. We disagree.

The following additional facts are necessary to resolve this issue. On cross-examination, the victim admitted that she spoke to her social worker, Muldrow, the same day that she ran away from the foster home, and that she did not tell Muldrow about the alleged incidents with the defendant. The victim testified that she told Muldrow and Clarke about the incidents after she ran away, and that she remembered telling them that she was afraid to tell anyone about the incidents before that time. The victim also testified that she told Muldrow and Clarke that she was afraid to tell Gonzalez about the incidents because Gonzalez would not believe her. The victim admitted that Gonzalez had previously caught her in lies regarding the victim's attendance at school.[10]

---

[10] The transcript reveals the following:

"Q. Do you recall if you told them that you were afraid [Gonzalez] wouldn't believe you?

"A. Yes.

"Q. Why did you think [Gonzalez] wouldn't believe you?

"A. Because he's her boyfriend and I'm just a foster kid.

"Q. Were there any other reasons why you think [Gonzalez] would not have believed you?

"A. No.

"Q. Had she ever caught you in any lies?

"A. Yes.

\* \* \*

"Q. Had you lied to [Gonzalez] about attending school?

"A. Yes.

"Q. And what was that about?

After the state rested, the defendant made an offer of proof regarding the testimony of Gonzalez. Specifically, the defendant sought to have Gonzalez testify that (1) the victim was suspended from school, (2) Gonzalez subsequently learned of the suspension, (3) Gonzalez confronted the victim and contacted Muldrow, (4) the victim spoke with Muldrow, and (5) later that same day the victim ran away from the foster home. According to the defendant, the proscribed testimony would have provided the jury with a fuller picture of the events precipitating the victim's running away, and would have presented the jury with an alternative reason for the victim to have run away. According to the defendant, this testimony also would have gone to the victim's possible motive or interest in making accusations about Gonzalez' boyfriend. The trial court refused to allow this testimony, stating that the questions about the victim's suspension from school were "collateral, irrelevant, and . . . an effort to discredit the character of the . . . victim in front of the jury."

We begin by noting that although the defendant argues that the trial court's ruling denied him his constitutional rights to confront witnesses and to present a defense, the trial court's ruling was evidentiary in nature. "Every evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error. In this instance, the defend-

---

"A. That I would skip class.

"Q. Did you lie to [Gonzalez] about being suspended from school?

"A. Yes.

"Q. When you were suspended, would you leave [Gonzalez'] house as if you were going to school and spend the day someplace and then come home in the afternoon?

"A. Yes.

\* \* \*

"Q. Was the fact that you had lied to [Gonzalez] part of the reason why you were afraid [she] would not believe you if you told her about [the defendant] bothering you?

"A. Yes."

ant has put a constitutional tag on a nonconstitutional claim." (Internal quotation marks omitted.) *State* v. *Moales*, 41 Conn. App. 817, 824, 678 A.2d 500, cert. denied, 239 Conn. 817, 682 A.2d 1011 (1996). "The trial court has broad discretion in ruling on the admissibility of evidence. . . . The determination of the relevancy and remoteness of evidence is within the sound discretion of the trial court. . . . This court will not disturb the trial court's ruling on evidence unless a clear abuse of discretion is shown." (Citations omitted; internal quotation marks omitted.) *State* v. *Miller*, 202 Conn. 463, 482, 522 A.2d 249 (1987).

On the basis of the record before us, we conclude that the trial court did not abuse its discretion when it refused to allow this testimony of Gonzalez. The defendant argues that although the trial court allowed him to elicit from the victim that she lied to Gonzalez about being suspended, the court denied him the opportunity to attempt to prove the more significant facts that the confrontation about the suspension culminated in Gonzalez' calling DCF and the victim's running away that day. We agree with the state, however, that the court precluded the defendant from presenting evidence regarding only the specifics of the lie. Gonzalez did in fact testify that the victim left the house on the same day that Gonzalez discussed the school suspension with the victim. We also agree that the facts underlying the victim's lie to Gonzalez were collateral to the issue of whether the defendant was guilty of the crimes charged, and were prejudicial to the credibility of the victim.

The judgment is affirmed.

In this opinion the other judges concurred.