******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MICHAEL
ANTHONY GUERRERA
(AC 37171)
(AC 38312)

Gruendel, Beach and Flynn, Js.*

*Argued February 2—officially released July 19, 2016*

(Appeal from Superior Court, judicial district of New
Britain, Alander, J.)

*John L. Cordani*, *Jr.*, with whom, on the brief, was
*Damian K. Gunningsmith*, for the appellant in both
cases and the cross appellee in AC 38312 (defendant).

*Jonathan M. Sousa*, special deputy assistant state's
attorney, with whom, on the brief, were *Brian Preleski*,
state's attorney, and *John H. Malone*, supervisory assis-
tant state's attorney, for the appellee in both cases and
the cross appellant in AC 38312 (state).

*Opinion*

BEACH, J. This decision concerns two appeals, AC 37171 and AC 38312, and a cross appeal in AC 38312 arising from the same underlying criminal case. In a single, consolidated trial, a jury found the defendant, Michael Guerrera, guilty of assault in the first degree in violation of General Statutes §§ 53a-8 (a) and 53a-59 (a) (1), conspiracy to commit the assault in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-59 (a) (1), and tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1). The jury found the defendant not guilty of unlawful restraint in the first degree and conspiracy to commit murder. The jury was unable to reach a verdict as to the remaining charges of murder, conspiracy to commit kidnapping in the first degree, felony murder, and kidnapping in the first degree. The defendant moved to dismiss these remaining charges, and the court denied in part and granted in part the motion.

In AC 37171, the defendant claims that the trial court erred by (1) concluding that the state had no *Brady*[1] obligation to review or to disclose the contents of telephone recordings preserved by the Department of Correction (department) at the state's request; (2) excluding from evidence a recording of a coparticipant's jail visit with his mother; (3) refusing to grant an evidentiary hearing on a possible violation of a sequestration order; and (4) concluding that there was sufficient evidence to sustain the defendant's conviction of tampering with physical evidence. In AC 38312, the defendant claims that the state is collaterally estopped under the double jeopardy clause from retrying him on the charges of murder, kidnapping, and felony murder with the predicate felony of kidnapping. In its cross appeal, the state claims that the court improperly dismissed the charge of conspiracy to commit kidnapping in the first degree. We do not agree with any of the defendant's claims in either of his appeals, nor do we agree with the state's claim in its cross appeal. Accordingly, we affirm the judgments of the trial court.

As an initial matter, the underlying factual and procedural histories of these appeals warrant a thorough recitation and review. The jury reasonably could have found the following facts. The defendant and his brother, Dennis Guerrera, grew up in separate homes, but at some point Dennis Guerrera moved in with the defendant; Naomi Ball, their biological mother; and the defendant's stepfather at their home in Waterbury. Dennis Guerrera had grown up in Bristol, and he eventually introduced the defendant to his friends in the area. These friends included Sarah Boilard and Michael Boilard, as well as Jonathan Wilcox, and Dylan Sherman, the victim. Sarah Boilard had dated both the victim and Dennis Guerrera at different times.

The events surrounding the victim's death began on February 21, 2011. That afternoon, Sarah Boilard and Michael Boilard picked up the defendant and Dennis Guerrera from their apartment in Waterbury, went to a Blockbuster store and then brought the brothers to the apartment the Boilards shared with Michael Boilard's children at 56 Ingraham Place in Bristol. At one point during the evening, the victim called Sarah Boilard and asked if he and his cousin, Josh Desrosier, could come over to the Boilard residence. Sarah Boilard and Dennis Guerrera went to meet the victim and Desrosier at Fast Freddies, a Bristol gas station. The four returned to the Boilards' apartment.

Sarah Boilard, the victim, and Desrosier went into Sarah Boilard's bedroom while Michael Boilard, the defendant, and Dennis Guerrera watched a movie. At one point during the movie, the defendant went into Sarah Boilard's bedroom to retrieve a pair of Michael Boilard's pants, which contained Michael Boilard's wallet, keys, and cigarettes. The defendant gave Michael Boilard his pants. The victim and Desrosier left the apartment shortly thereafter. The defendant and Dennis Guerrera spent the night at the apartment.

The following morning, Michael Boilard claimed that he had discovered that $750 in cash was missing from his wallet. When the defendant and Dennis Guerrera woke up, Michael Boilard demanded that they empty their pockets so that he could see whether either of them had the missing money. Both the defendant and Dennis Guerrera refused to let him search their pockets. Michael Boilard approached the defendant and attempted to frisk him. The defendant replied, "Are you serious? [The victim] was probably the one who stole it, not [me]." Id. Michael Boilard told the brothers "to do what they have to do, just get the money back."

The defendant, Dennis Guerrera, and Sarah Boilard then spent approximately one hour walking around Bristol in search of the victim. At about noon, Sarah Boilard called Michael Boilard to pick up her, and the defendant and Dennis Guerrera. He brought the three of them back to the Boilards' apartment. Michael Boilard left for work at about 3 o'clock in the afternoon. After Michael Boilard left, Sarah Boilard called the victim. She asked him if he had taken the money, and the victim replied that he had not.

For the next several hours, the defendant, Dennis Guerrera, and Sarah Boilard went to various stores, watched a movie, listened to music, and ate dinner. They were not looking for the victim at that time, but after dinner Dennis Guerrera told Sarah Boilard that he wanted to try to call the victim again. She refused to let him use her cell phone. The defendant used the cell phone he shared with Dennis Guerrera to call the victim himself. The defendant argued with the victim

and threatened to "kick his ass." After five minutes of arguing, the defendant asked the victim to come over to talk about the situation and figure out what had happened to the money. The defendant assured the victim that if he came over, "there won't be any problems."

While waiting for the victim to arrive, Dennis Guerrera grabbed a wooden baseball bat from the bedroom. He then told Sarah Boilard to "get out," and she went outside of her apartment building and paced around. She was afraid that the defendant and Dennis Guerrera planned to fight the victim. The victim arrived and went into the Boilards' apartment. A neighbor outside of the apartment overheard arguing, glass breaking, and a man's voice screaming from inside the apartment. The neighbor specifically heard a man yell, "[d]ude, please stop!" The defendant testified that Dennis Guerrera had struck the victim in the head with the baseball bat numerous times. The defendant claimed that he had been injured from attempting to stop Dennis Guerrera from attacking the victim. The state police later obtained blood from inside the apartment matching the victim's and the defendant's DNA.

The defendant, Dennis Guerrera and the victim exited the apartment. The defendant ordered Sarah Boilard to "clean up the mess." When she refused, the defendant called her an "ungrateful spoiled bitch." He also told her that if she talked to the police, and he "gets put away or locked up, that when he gets out that [Sarah Boilard was] next." As Sarah Boilard started to walk away, she overheard the victim say, "I want to go home, please let me go home, I won't tell anybody." When she finally returned to the apartment, Sarah Boilard observed that the wooden baseball bat had been placed back in the bedroom closet and was stained with blood. She also noticed that her brother's aluminum baseball bat was missing.

Meanwhile, Wilcox received a telephone call from either the defendant or Dennis Guerrera. The caller—Wilcox could not discern which brother had placed the call—stated that they had fought with the victim at the Boilards' apartment and requested that Wilcox pick them up at Fast Freddies. When Wilcox arrived at Fast Freddies, Dennis Guerrera got in the front seat and the defendant and the victim sat in the back of the car. The defendant held an aluminum baseball bat. The victim asked Wilcox to take him to the hospital, but the defendant told him to be quiet. Wilcox suggested that they take the victim to an area referred to as Buttermilk Falls in Terryville, and the defendant and Dennis Guerrera agreed.

Upon arriving at the trailhead to Buttermilk Falls, Wilcox stopped the car. Dennis Guerrera and the defendant, who was still holding the baseball bat, retreated into the woods with the victim. Several minutes later,

the defendant and Dennis Guerrera emerged from the woods without the victim. Getting back into the car, the defendant told Wilcox that he and Dennis Guerrera had used the baseball bat to hit the victim several times and that "blood was going everywhere . . . ." The victim began twitching, and the defendant and Dennis Guerrera resumed beating the victim with the baseball bat until the victim stopped moving completely. Wilcox observed that both Dennis Guerrera and the defendant had blood on their hands and clothing.

On the morning of February 23, 2011, the victim's body was discovered by a hiker in Buttermilk Falls. A state medical examiner concluded that the victim's death had been caused by blunt traumatic head injury. On February 24, 2011, the police arrested the defendant, Dennis Guerrera, Sarah Boilard, Michael Boilard, and Wilcox for their participation in the various crimes perpetrated against the victim.

The defendant told the police, and later testified consistently with these initial statements, that he had tried to stop Dennis Guerrera from beating the victim at the Boilards' apartment. The defendant claimed that he had helped the victim clean his wounds and assisted him out of the apartment. According to the defendant, he and the victim entered Wilcox's car only because Wilcox threatened them with a shotgun. Once they reached Buttermilk Falls, the defendant alleged that he had stayed in the car with Wilcox while Dennis Guerrera took the victim and the aluminum baseball bat into the woods.

Dennis Guerrera pleaded guilty to assault in the first degree and murder. Following ten days of evidence and one week of deliberations, the jury found the defendant guilty of assault in the first degree as an accessory, conspiracy to commit assault in the first degree, and tampering with physical evidence. The jury found the defendant not guilty of unlawful restraint in the first degree and conspiracy to commit murder. The jury was unable to reach a verdict as to the charges of murder, felony murder, kidnapping in the first degree, and conspiracy to commit kidnapping in the first degree. The court sentenced the defendant to thirty-four years of incarceration and ten years of special parole.

In August, 2014, the defendant filed a motion to dismiss the four charges on which the jury could not reach a verdict. This motion was granted as to the conspiracy to commit kidnapping charge, but denied as to the three remaining charges. These appeals, as well as the state's cross appeal, followed. Additional facts relevant to each claim will be set forth accordingly.

I

DEFENDANT'S APPEAL IN AC 37171

A

The defendant claims that the court erred by concluding that the state had no *Brady* obligation with respect to unreviewed telephone recordings preserved by the department when the court had found that the department had been acting as the investigative arm of the State's Attorney's Office in preserving the recorded calls. The defendant asks us to direct the state to disclose the recordings to the defense or to review the 1300 recordings ourselves and disclose any exculpatory information. We disagree with the defendant's claim and deny the relief sought.

Additional facts are necessary to resolve this claim. In its memorandum of decision issued on October 10, 2013, the court found the following relevant facts. The department records all inmate telephone calls and any noncontact visits with inmates by members of the public. An inspector from the State's Attorney's Office requested that the department preserve and monitor the telephone calls of Michael Boilard, Sarah Boilard, and Wilcox on approximately March 1, 2011. The State's Attorney's Office had also asked the department to monitor the calls of the defendant and Dennis Guerrera. Donald Lavery, the department telephone monitor assigned to review these calls, testified that he monitored approximately 10 percent of the 1300 recorded calls by using criteria developed by the department that helped identify the calls that were most likely to contain relevant information. When Lavery determined that a specific call that he reviewed related to the criminal case, he took notes and forwarded the information to the State's Attorney's Office. At that point, the office would determine whether it wanted to obtain a copy of the call from the department through the service of a subpoena or by executing a search warrant. Prior to his trial, the defendant caused a subpoena to be served on the department to produce copies of the recorded conversations. The state responded with a motion to quash.

In granting the state's motion, the court concluded that in this exceptional case, the department had acted as an arm of the state in the investigation of the crimes at issue.[2] Moreover, "[t]he evidence does establish that some calls . . . do involve relevant matters. . . . These calls are appropriately the subject of the defendant's subpoena." The court determined, however, that because the defendant offered no evidence that the unreviewed recordings contained relevant material and seemed to rely solely on "blind hope that some of them may contain relevant material," the subpoena amounted to a "classic fishing expedition." The court ordered the department to provide the defendant with copies of any recorded calls that had been reviewed and that concerned the pending case and the defendant's criminal charges, and any calls for which the department had provided the state with notes.

On appeal, the defendant argues that the state possessed constructive knowledge of any material the department had preserved, regardless of whether the material actually had been reviewed by the department or the state, because the department had been acting as an investigative arm of the state. The state's *Brady* obligation, the defendant claims, extended to any exculpatory evidence produced by its investigation, including the recordings. Our review of this issue is plenary. "Whether the [defendant] was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review. . . . The conclusions reached by the [trial] court in its decision . . . are matters of law, subject to plenary review. . . . Thus, [w]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record. . . . *Walker* v. *Commissioner of Correction*, 103 Conn. App. 485, 491, 930 A.2d 65, cert. denied, 284 Conn. 940, 937 A.2d 698 (2007)." (Internal quotation marks omitted.) *Hoskie* v. *Commissioner of Correction*, 110 Conn. App. 845, 847–48, 956 A.2d 611, cert. denied, 289 Conn. 950, 960 A.2d 1037 (2008).

"The United States Supreme Court has held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. *Brady* v. *Maryland*, supra, 373 U.S. 87; *State* v. *Walker*, 214 Conn. 122, 126, 571 A.2d 686 (1990). To prevail on a *Brady* claim, the defendant bears a heavy burden to establish: (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that it was material. . . . *State* v. *Burke*, 51 Conn. App. 328, 333, 723 A.2d 327 (1998), cert. denied, 248 Conn. 901, 732 A.2d 177 (1999)." (Internal quotation marks omitted.) *Hoskie* v. *Commissioner of Correction*, supra, 110 Conn. App. 847. "If . . . the [defendant] has failed to meet his burden as to one of the three prongs of the *Brady* test, then we must conclude that a *Brady* violation has not occurred." *Morant* v. *Commissioner of Correction*, 117 Conn. App. 279, 296, 979 A.2d 507 (addressing only materiality prong of *Brady* test in concluding no *Brady* violation had occurred), cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009); see also *State* v. *Ortiz*, 280 Conn. 686, 717, 911 A.2d 1055 (2006) (explaining that all three components of *Brady* test must be established to prevail on *Brady* claim).

"Evidence that is not disclosed is suppressed for *Brady* purposes even when it is known only to police investigators and not to the prosecutor. . . . In addition, evidence is favorable if it is either exculpatory or impeaching. . . . Finally, evidence is material if there

is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (Citations omitted; internal quotation marks omitted.) *Morant* v. *Commissioner of Correction*, supra, 117 Conn. App. 285.

We begin by determining whether the defendant satisfied his burden to establish that the information contained in the recordings was favorable to the defense. The defendant asserts that the state and the department had "constructive knowledge" of any exculpatory information in the conversations that were recorded. This argument is not responsive to the requirements of the *Brady* analysis. Simply because the state and the department might be deemed to have constructive knowledge of the contents of the recordings does not necessarily indicate that the recordings in fact contained evidence "favorable to the defense," as required by the *Brady* test.

The defendant is correct in his argument that the prosecutor is deemed to have constructive knowledge of exculpatory information within his or her files. In *Demers* v. *State*, 209 Conn. 143, 150–51, 547 A.2d 28 (1988), a case relied on by both parties and the trial court, our Supreme Court held that "[t]he prosecution's duty to disclose applies to all material and exculpatory evidence that is within its possession or *available to it* . . . . Where evidence highly probative of [a defendant's] innocence is in [the prosecutor's] file, he should be presumed to recognize its significance even if he has actually overlooked it . . . ." (Citations omitted; emphasis in original; internal quotation marks omitted.) Nevertheless, "[a] defendant's right to discover exculpatory evidence . . . does not include the unsupervised authority to search through the [state's] files. . . . Defense counsel has no constitutional right to conduct his own search of the [s]tate's files to argue relevance." (Internal quotation marks omitted.) *State* v. *Colon*, 272 Conn. 106, 267, 864 A.2d 666 (2004) (distinguishing between valid *Brady* violation claim in which state withholds exculpatory information and defendant's claim that he was entitled to "an opportunity to sift through the records of the office of the chief state's attorney in search of a *potential Brady* violation" [emphasis in original]), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

*Demers* presents a compelling example of a prosecutor's constructive knowledge of exculpatory evidence warranting disclosure to the defense under *Brady*. The petitioners in *Demers* had been convicted of sexual assault, robbery, and unlawful restraint, and had sought and been granted a new trial. On the respondent state's appeal, the petitioners argued that a Connecticut police department—other than the one involved in the prosecution of the underlying criminal action and located in a different jurisdiction—possessed an arrest report that

showed the victim had been arrested for prostitution ten months prior to her alleged sexual assault by the petitioners. Id., 149. The police report stated that the victim had walked over to a car, opened the door, and tried to escape when she realized the individual in the car was a police officer. Id., 158. At trial, the petitioners contended that the victim had walked up to their car in the same city in which she previously was arrested, and propositioned them to engage in sex for money. Id., 148. There was, then, a factual similarity between the petitioners' account of the alleged sexual assault and the police report. See *Demers* v. *State*, supra, 209 Conn. 147–48, 158.

The facts of the present case are readily distinguishable. In *Demers*, the state was "well aware of the fact that the [petitioners'] defense to the sexual assault charges against them, from the very inception of the case, was that the victim was a prostitute and had consented to the sexual acts alleged in return for payment." Id., 151. Yet, when defense counsel informed multiple members of the State's Attorney's Office that he had "received information from the Waterbury police department, residents of the Grove Street area, and an assistant state's attorney that the victim was a known drug user and a prostitute," the state merely asked the victim if she had been convicted of prostitution and did not conduct even a cursory investigation to determine the accuracy of the information. Id., 152. Here, there is nothing to indicate that the evidence contained in the recordings is even potentially helpful to the defendant. The defendant provided the court with no evidence that any exculpatory information was recorded at all. Indeed, at the hearing on the motion to quash, counsel for the defendant conceded that "I can't cite anything exculpatory, [but] there may very well be exculpatory information that is not being turned over because nobody listened to it." Unlike the State's Attorney's Office in *Demers*, which specifically had been directed to the victim's arrest record, the state here did not have any information or indication that the recordings contained exculpatory evidence. The state, then, had no reason to conduct a more thorough investigation into the voluminous recordings preserved by the department.[3]

Another case by our Supreme Court, *State* v. *Colon*, supra, 272 Conn. 267, further supports our rejection of the defendant's argument. There, the defendant subpoenaed the State's Attorney's Office for documents regarding an investigation into alleged corruption at a Connecticut police department. The state filed a motion to quash, arguing that the documents were privileged. Id., 261. The trial court granted the state's motion because, inter alia, the defendant had not established that the documents contained exculpatory information. Id., 262–63. On appeal, the defendant argued that he should be permitted to review the records for exculpa-

tory material, or, alternatively, that our Supreme Court should review the records. Id., 266. The court rejected the defendant's claim, noting that "the defendant's claim is *not* that the state violated *Brady* by withholding certain exculpatory or material information. Rather, the defendant is seeking an opportunity to sift through the records of the office of the chief state's attorney in search of a *potential Brady* violation." (Emphasis in original.) Id., 267.

Although the records in *Colon* had been reviewed by the State's Attorney's Office and determined by the office and the trial court to contain no exculpatory material, *Colon* is fatal to the defendant's argument in the present matter. Without any showing by the defendant that the recordings contain exculpatory material and a failure to point to any authority that suggests such a showing is unnecessary, we conclude that the defendant does not have the right under *Brady* to review the recordings in an attempt to locate exculpatory material.

We need not address the remaining prongs of the *Brady* test because the defendant has not met his burden of establishing that the recordings contain exculpatory evidence. See *State* v. *Esposito*, 235 Conn. 802, 815, 670 A.2d 301 (1996) (declining to review whether undisclosed evidence was favorable to defense because defendant did not show evidence was material). We conclude that there was no *Brady* violation, and we therefore deny the defendant's request for access to the department's recordings.

B

The defendant claims that the court abused its discretion when it excluded from evidence the department's recording of a visit between Dennis Guerrera and Naomi Ball, the mother of Dennis Guerrera and the defendant. He argues that the court's decision to exclude the hearsay statement of Dennis Guerrera was an evidentiary error—or, in the alternative, a constitutional error[4]—because the statement was inconsistent with other hearsay statements made by Dennis Guerrera that had been introduced into evidence and its exclusion impeded the defendant's ability to present a defense. We disagree.

Additional facts assist us in our resolution of this claim. During the defendant's trial, the state's witnesses testified as to hearsay statements supposedly made by Dennis Guerrera that arguably implicated the defendant in the assault and murder.[5] In response to this testimony, the defendant sought to introduce a recorded conversation between Dennis Guerrera and Ball. This conversation occurred in prison, after Dennis Guerrera had been convicted and sentenced. The defense proffered—without playing the recording—that it contained a statement made by Dennis Guerrera in which he said, "I did it, and I copped out, and because I did it, I didn't go

to trial."[6] The state objected to the proposed evidence as hearsay. The court concluded that the statement did not fall within either of the hearsay exceptions cited by the defendant; it was neither a statement against penal interest nor an inconsistent statement. The court explained that "for someone to say, 'I committed murder,' is not inconsistent with somebody else [doing] it, too . . . ." At the conclusion of the trial, the defense renewed its argument in a motion for a new trial, which the court subsequently denied.

We first address the defendant's evidentiary claim. Our standard of review as to this issue is well settled. A trial court's determination as to whether statements are inconsistent is reviewed for an abuse of discretion. "The admissibility of evidence, including the admissibility of a prior inconsistent statement . . . is a matter within the . . . discretion of the trial court. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . [T]herefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 56, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006).

As we have noted, several hearsay statements of Dennis Guerrera had been admitted into evidence. Section 8-8 of the Connecticut Code of Evidence provides that when hearsay has been admitted into evidence, "[e]vidence of a statement of the declarant made at any time, inconsistent with the declarant's hearsay statement, need not be shown to or the contents of the statement disclosed to the declarant." To be considered inconsistent, two statements need not contradict one another; inconsistencies may also be shown by omissions. *State* v. *Simpson*, 286 Conn. 634, 649, 945 A.2d 449 (2008). "In determining whether an inconsistency exists, the testimony of a witness as a whole, or the whole impression or effect of what has been said, must be examined. . . . Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . . A statement's inconsistency may be determined from the circumstances and is not limited to cases in which diametrically opposed assertions have been made." (Internal quotation marks omitted.) Id.

The trial court properly found that the recorded statement made by Dennis Guerrera was not inconsistent with the hearsay statements attributed to him in which he was said to have used plural pronouns to describe his activity when the various crimes were committed. The defendant invites us to infer that the statement, "I did it," undermined Dennis Guerrera's other statements of, "we did it," that had been adduced at trial from various witnesses. The court acted within its discretion

in rejecting that inference and finding that Dennis Guerrera's admission of responsibility did not foreclose the possibility that someone else, namely, the defendant, had participated in the criminal acts.

Contrary to the defendant's argument, the court did not apply "a legal standard that required diametrically opposed statements for inconsistency," in contravention of the principles of *State* v. *Simpson*, supra, 286 Conn. 649. Rather, the court properly applied the rule that "statements from which a possible inference of inconsistency may be drawn are insufficient for the purpose of impeachment." *State* v. *Richardson*, 214 Conn. 752, 764, 574 A.2d 182 (1990). This principle squarely applies to the present case. Although an inference possibly could be drawn that Dennis Guerrera's use of "I" when admitting his culpability indicated that he had acted alone in contrast to previous statements in which he used the word "we" to describe culpability, this "possible inference of inconsistency"; *State* v. *Richardson*, supra, 764; does not *require* the court to admit the evidence as an inconsistent statement. See id.

The contexts in which the various hearsay statements were made do not necessarily compel the conclusion that the meanings of the statements were inconsistent. Dennis Guerrera repeatedly used the pronoun "we" when relating to his friends how the crime happened. He used the pronoun "I" in the course of the conversation with Ball in explaining his personal decision to plead guilty. These differing contexts further support our conclusion that the statements are not necessarily inconsistent.

The defendant also argues, "Dennis Guerrera had a strong incentive to implicate [the defendant] by stating, 'we did it,' to keep [the defendant] from reporting the events," and he well may have "had every reason to be truthful to [Ball] and not to omit mention of [the defendant's] alleged role." The reliability of Dennis Guerrera's statement is not at issue, however; rather, the statement's inconsistency with Dennis Guerrera's previous statements concerned the court. The reliability, or lack thereof, of the hearsay statements that were introduced into evidence has no bearing on whether the recording properly was excluded on the basis of its consistency with other statements.

We also disagree with the defendant's claim that the exclusion of this evidence violated his sixth amendment right to impeach witnesses against him with prior inconsistent statements. See *State* v. *Calvin N.*, 122 Conn. App. 216, 224, 998 A.2d 810, cert. denied, 298 Conn. 909, 4 A.3d 834 (2010). In *Calvin N.*, this court held that the trial court erred in excluding from evidence a letter allegedly written by the victim in which she denied her previous allegations against the defendant. Id., 228–29. This error, we concluded, was constitutional in nature because, even though the state claimed that the letter

was written by the victim's mother, the "precluded inquiry . . . had a great potential of casting doubt on the [victim's] credibility. . . . [T]he defendant did not have the opportunity to question the [victim] about the letter . . . [which] had the effect of depriving the defendant of a significant means of attacking the [victim's] version of events." Id., 228.

Irrespective of the defendant's various analogies between the present matter and *Calvin N.*, the court did not commit an evidentiary error in its exclusion of the recording, and there is no constitutional error.[7] "The constitution does not require that a defendant be permitted to present every piece of evidence he wants. . . . The court retains the power to rule on the admissibility of the proffered evidence pursuant to evidentiary standards; hence, the question is evidentiary and not constitutional. . . . [E]very evidentiary ruling which denies a defendant a line of inquiry to which he thinks he is entitled is not constitutional error." (Citations omitted; internal quotation marks omitted.) *State* v. *Jenkins*, 56 Conn. App. 450, 455, 743 A.2d 660, cert. denied, 252 Conn. 947, 747 A.2d 523 (2000).

In sum, we conclude that the court did not improperly exclude the recording on either an evidentiary or a constitutional basis.

C

The defendant next claims that the court erred in denying his request for an evidentiary hearing regarding potential violations of the court's sequestration order and in failing to find a violation of the court's sequestration order. We disagree.

Connecticut courts have recognized that the trial court has "broad discretion to determine the form and scope of the proper response to allegations of . . . misconduct." (Internal quotation marks omitted.) *State* v. *Nguyen*, 253 Conn. 639, 654, 756 A.2d 833 (2000). Thus, "[w]e will not reverse the court's remedy for a violation of a sequestration order absent a finding that the court abused its discretion." *State* v. *McCown*, 68 Conn. App. 815, 820, 793 A.2d 281, cert. denied, 260 Conn. 927, 798 A.2d 972 (2002).

"The right to have witnesses sequestered is an important right that facilitates the truth-seeking and fact-finding functions of a trial." (Internal quotation marks omitted.) *State* v. *Nguyen*, supra, 253 Conn. 649. Sequestration "is a procedural device that serves to prevent witnesses from tailoring their testimony to that of earlier witnesses; it aids in detecting testimony that is less than candid and assures that witnesses testify on the basis of their own knowledge." Id. "In essence, [sequestration] helps to ensure that the trial is fair. . . . A trial court must take full account of the significant objections advanced by sequestration in discerning the proper scope of a sequestration order." (Internal quota-

tion marks omitted.) *State* v. *Outing*, 298 Conn. 34, 73, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011). Our Supreme Court has concluded that "the primary objective of a sequestration order . . . is undermined, not only when a prospective witness hears the testimony of a prior witness firsthand, but also through the disingenuous strategy of effectively transmitting a prior witness' testimony to a prospective witness via a third party." (Internal quotation marks omitted.) Id., 74.

On November 5, 2013, the second day of evidence at the defendant's trial, the state requested that the court issue a sequestration order pursuant to Practice Book § 42-36 for both parties. The defense consented, and the court issued an order that "any prospective witness not be present in the courtroom during the testimony of any other witness." On November 7, 2013, defense counsel informed the court that Ball had overheard three of the state's witnesses, April Wells, Amanda Wells, and Katlynn Guerrera, discussing the trial with two individuals who had been observing the trial, "Tina" and "Portia." Ball claimed to have overheard Tina and Portia tell the witnesses that Sarah Boilard had testified that she and the defendant had dated, and that Wilcox had testified that he observed the defendant with the baseball bat. Defense counsel asked the court to preclude the testimony of April Wells, Amanda Wells and Katlynn Guerrera as a result of the alleged sequestration violation.

The state notified the court that it had spoken with Tina and Portia. Both denied having the conversation with the witnesses. Moreover, an inspector for the state had spoken to the three witnesses to ensure that they had not spoken to anyone about what occurred in the courtroom. The court did not determine whether the sequestration order had been violated, and it resolved the issue by informing defense counsel that he could cross-examine the three witnesses about the alleged conversation. The defendant rejected this offer, noting that it was unlikely the witnesses would admit to having conversed with Tina and Portia. The defendant moved for a mistrial, but the court responded that defense counsel had not "presented to me . . . any other evidence that, quote, unquote, a lot more has happened. All you've said to me is, those two instances and very limited conversations. And you want me to speculate that a lot more has happened."

On appeal, the defendant argues that although the order facially may have been limited to preventing witnesses from being present in the courtroom, the order was intended to prevent witnesses from learning about the testimony of other witnesses. Thus, the defendant claims, the court erred in interpreting its sequestration order. In reaching its decision, the court considered the representations of the state and defense counsel. It

acknowledged that "there's a factual dispute here as to whether in fact anything was said." In its discretion, the court concluded that cross-examination would be an appropriate remedy, given that the alleged violations were narrow in scope, the alleged violators denied that the discussion had occurred at all, and the defense had not indicated, beyond asking the court to infer other, greater violations had occurred, that any more serious violations had taken place.

Cross-examination may be an appropriate mechanism by which to remedy the potential unfairness resulting from the violation of a sequestration order. See *State* v. *David N.J.*, 301 Conn. 122, 148, 19 A.3d 646 (2011) (holding that court had discretion to permit cross-examination as remedy for apparent violation of sequestration order in accordance with federal cases, including *Holder* v. *United States*, 150 U.S. 91, 92, 14 S. Ct. 10, 37 L. Ed. 1010 [1893]). In other cases, however, the court may choose to preclude a witness from testifying or to strike a witness' testimony to remedy unfairness resulting from a violation. See *State* v. *McCown*, supra, 68 Conn. App. 823. Nevertheless, "the exclusion of witness testimony . . . is not the preferred remedy for a violation of a sequestration order." Id., 821.

Cases in which Connecticut courts previously have held that the exclusion of witness testimony was an appropriate remedy for a particular sequestration violation are readily distinguishable from the present matter. In *State* v. *McCown*, supra, 68 Conn. App. 819, for example, the defendant sought to have his mother testify to his intellectual capabilities after she had been present in the courtroom and heard the detective who had taken the defendant's statement testify about his observations of the defendant when the detective had questioned him. This court determined that the defendant's mother "had the ability to tailor her testimony to that of [the detective's] . . . . Equally, [the defendant's mother] had a motive here to modify her testimony to match [the detective's]." Id., 822. In the present matter, the defendant has not alleged that the witnesses had any motive to tailor their testimony to be consistent with other witnesses on the two limited subjects that were supposedly discussed.[8] Moreover, there was a clear violation of the sequestration order in *McCown* because the defendant's mother physically was present in the courtroom when the expert testified. Given the extreme and glaring nature of the violation in *McCown*, exclusion of the testimony of the defendant's mother's was appropriate, whereas the potential violation in this case was less palpable because the witnesses were alleged to have discussed the testimony of other witnesses, but were not present in the courtroom during such testimony, and the reported conversation, even if it actually occurred, was not about matters central to the case.

In *State* v. *Robinson*, 230 Conn. 591, 603, 646 A.2d 118 (1994), our Supreme Court held that the trial court clearly abused its discretion by permitting a state's witness, subject to a sequestration order, to testify after having listened to the testimony of all of the defense witnesses. The violation warranted the subsequent striking of the witness' testimony because the testimony was critical, and the Supreme Court thought it "likely" that the witness had been influenced by the testimony he had heard. Id., 601. Significantly, the witness was a uniformed correction officer who perhaps had enhanced credibility with the jury because he was an officer. Id., 602. The defense's cross-examination of this witness was ineffectual because "there was no evidentiary foundation by which to gauge [its] accuracy . . . ." Id., 603. In contrast, the witnesses who testified in the present matter had been impeached by the defense on other grounds, they likely did not enjoy a degree of enhanced credibility with the jury, and the defense did have an evidentiary basis on which to cross-examine the witnesses. Finally, the defense has not argued that the testimony about Sarah Boilard's relationship with the defendant and the testimony about the defendant holding the baseball bat were critical to the outcome of the trial.

We disagree with the defendant's argument that because (1) it was disputed whether Tina and Portia discussed testimony with the witnesses, (2) it was unknown whether other information about the case was discussed by the parties, and (3) the extent of prejudice to the defendant was unknown, the court was required to grant the defense's request for an evidentiary hearing. The court had the discretion to weigh the information before it in fashioning an appropriate remedy. The defendant rejected this remedy because of a concern that the witnesses would lie; however, the record reveals no evidence that compels the conclusion that the court abused its discretion by fashioning an inadequate remedy. We therefore reject this claim and conclude that the court did not abuse its discretion.

D

In his final claim in this appeal, AC 37171, the defendant argues that there was insufficient evidence to sustain the verdict on the charge of tampering with physical evidence pursuant to § 53a-155. He asserts that under *State* v. *Jordan*, 314 Conn. 354, 102 A.3d 1 (2014), there was insufficient evidence of the statute's element of intent—"believing that an official proceeding is pending, or about to be instituted"—when he cleaned the victim's blood from the Boilards' kitchen the day after the murder. See General Statutes § 53a-155. We disagree.

As an initial matter, we set forth our standard of review and relevant legal principles. "In reviewing the

sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . [I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence. The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Perez*, 147 Conn. App. 53, 64–65, 80 A.3d 103 (2013), cert. granted in part on other grounds, 311 Conn. 920, 86 A.3d 468 (2014).

Section 53a-155 (a) provides in relevant part: "A person is guilty of tampering with . . . physical evidence if, believing that an official proceeding is pending, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding . . . ." The defendant argues that the jury could not reasonably have concluded that he believed that a proceeding against him was probable at the time he cleaned up the victim's blood from the Boilards' apartment.

With respect to the tampering charge, the state presented the following evidence. Three witnesses testified that the defendant wiped up blood in the Boilards' kitchen between 10 a.m. and 1 p.m. on the day after the victim's death. The victim's body was discovered at Buttermilk Falls at noon on that same day. Additionally, the defendant testified to the following: on the evening before the victim's death, the defendant was in the Boilards' apartment with Dennis Guerrera, the victim, Wilcox, and the Boilards; the defendant was present in the Boilards' apartment when the assault of the victim occurred; Sarah Boilard saw the victim and the defendant together shortly before the victim's death; the defendant rode in the car with Dennis Guerrera, Wilcox, and the victim on the way to Buttermilk Falls; and he was aware that Dennis Guerrera told April Wells and the defendant's stepfather about killing the victim on the morning after the victim's death.

We have considered our Supreme Court's decision in *State* v. *Foreshaw*, 214 Conn. 540, 572 A.2d 1006 (1990). The defendant in *Foreshaw* shot the victim in front of numerous witnesses before fleeing in a vehicle. As she was driving, the defendant threw the gun she had used to shoot the victim out of the vehicle's window. Shortly thereafter, the police found the defendant and arrested her. Id., 543. The defendant was convicted

of, inter alia, tampering with physical evidence. On appeal, she argued that her conviction was not supported by sufficient evidence because she had had no contact with law enforcement at the time she disposed of the gun; therefore, she could not have believed that an official proceeding was in the process of being initiated. Id., 550. The Supreme Court disagreed with the defendant's claim, holding that § 53a-155 "speaks to that which is readily apt to come into existence or be contemplated and thus plainly applies to the official proceeding arising out of such an incident." Id., 551. This court also has noted that "§ 53a-155 does not require a temporal proximity between the alleged act and the subsequent official proceeding." *State* v. *Perez*, supra, 147 Conn. App. 79.

In the present case, the state's evidence demonstrated that the defendant was aware that other individuals had seen him in the company of the victim just before the victim's death and that his brother had alerted their parents that the victim had been killed. Moreover, and as the defendant points out in his brief, various witnesses testified that he had told them that there was no evidence to connect him to the crime. Indeed, Michael Boilard testified that the defendant told him to keep Sarah Boilard "in check, which basically means . . . make sure she doesn't go to the authorities or whatever." The jury reasonably could have concluded from this evidence that at the time the defendant decided to clean up the blood, he was aware that an official proceeding resulting from an investigation into the victim's death would occur. Just as our Supreme Court rejected the defendant's argument in *Foreshaw*, in which the defendant claimed that she could not have believed an official proceeding would occur because she had had no contact with law enforcement when she threw the gun out of her vehicle's window and, thus, would not be the subject of any police investigation that could result in such a proceeding, we are not persuaded that the defendant in the present matter did not believe an official proceeding would be instituted merely because he may not have thought he ultimately would be held accountable.

The defendant invites us to draw a parallel between his insufficiency of the evidence claim and the claim of the defendant in *State* v. *Jordan*, supra, 314 Conn. 354, the facts of which our Supreme Court distinguished from those in *Foreshaw*. In *Jordan*, a bank employee witnessed the defendant attempt to rob the bank, and she alerted the police. Id., 359. A police officer near the bank heard the report over his radio and then observed the defendant. The officer called out, but the defendant ran. Id. When he lost sight of the police, the defendant disposed of his jacket and mask. Id., 360. The Supreme Court concluded that because the defendant's clothing was the only evidence linking him to the attempted bank robbery, it would have been unreasonable for the

jury to have inferred that the defendant believed that an official proceeding against him was probable when he disposed of the clothing. Id., 386. Rather, "the only reasonable inference from the facts in [*Jordan*] is that the defendant discarded his clothing to prevent its use in an investigation in order to escape detection and avoid being arrested by the pursuing police officer." Id., 388–89.

In the present matter, the jury could have inferred that the defendant was aware that a criminal prosecution was probable in light of the number of witnesses who had seen him with the victim, the threats he made to those witnesses to try to silence them, his knowledge that Dennis Guerrera told people about killing the victim, and his firsthand knowledge of the murder and the assault. Unlike the defendant in *Jordan* who had only his clothing to connect him to the crime scene, there was significant evidence, in addition to the blood, tying the defendant to the crime. This case presents one of the instances in which "a defendant's intent to keep evidence from the police may support a reasonable inference that the defendant also intends to keep evidence from being used in an official proceeding." Id., 389.

We conclude that there was sufficient evidence to support the defendant's conviction of tampering with physical evidence. Accordingly, the defendant's claim fails.

## II

### DEFENDANT'S APPEAL AND STATE'S CROSS APPEAL IN AC 38312

We now address the defendant's second appeal and the state's cross appeal. In his second appeal, the defendant claims that the state is collaterally estopped under the double jeopardy clause from retrying him on the charges of murder, kidnapping, and felony murder. In its cross appeal, the state argues that the court improperly dismissed the charge of conspiracy to commit kidnapping in the first degree on double jeopardy grounds.

"The standard of review to determine whether the defendant's constitutional right against double jeopardy was violated is de novo because it is a question of law. . . . The factual findings of the court that [determines] that issue, however, will stand unless they are clearly erroneous." (Internal quotation marks omitted.) *State* v. *Brown*, 132 Conn. App. 251, 255, 31 A.3d 434 (2011), cert. denied, 303 Conn. 922, 34 A.3d 396 (2012).

Collateral estoppel is "given constitutional dimensions by the double jeopardy clause." *State* v. *Aparo*, 223 Conn. 384, 388, 614 A.2d 401 (1992), cert. denied, 507 U.S. 972, 113 S. Ct. 1414, 122 L. Ed. 2d 785 (1993).[9] In the criminal context, collateral estoppel "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot

be litigated again between the same parties in any future lawsuit. . . . Collateral estoppel . . . may completely bar subsequent prosecution where one of the facts necessarily determined in the former trial is an essential element of the conviction the government seeks. . . .

"To establish whether collateral estoppel applies, the court must determine what facts were necessarily determined in the first trial, and must then assess whether the government is attempting to relitigate those facts in the second proceeding. . . . Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this approach requires a court to examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration. The inquiry must be set in a practical frame and viewed with an eye to all the circumstance of the proceedings." (Citations omitted; internal quotation marks omitted.) Id., 389–90.

The following facts and history of the proceedings as recounted by the court in its memorandum of decision regarding the defendant's motion to dismiss assist us in our resolution of the various claims presented in these appeals. "[T]he defendant was charged with various crimes in two separate informations. In the first information, docket number CR-11-0048020, the defendant was accused of committing the following offenses 'on or about February 22, 2011, at approximately 10:30 p.m., in or around 56 Ingraham Place, Bristol, Connecticut': (1) assault in the first degree, as a principal, as an accessory and vicariously liable as a coconspirator; (2) conspiracy to commit assault in the first degree; and (3) unlawful restraint in the first degree. The defendant was also charged in the first information with tampering with physical evidence, which allegedly occurred on or about February 23, 2011, at approximately 12:30 p.m., in or around 56 Ingraham Place in Bristol.

"In a second information, with the docket number . . . CR-11-0048453, the defendant was charged with committing the following offenses 'on or about February 22, 2011, at approximately 11:30 p.m., in or around the vicinity of Lane Hill Road, Terryville, Connecticut': (1) murder, as a principal, as an accessory and vicariously liable as a coconspirator; (2) conspiracy to commit murder; and (3) felony murder. In the same information, the defendant was charged with kidnapping in the first degree and conspiracy to commit kidnapping in the first degree, said crimes allegedly occurring between approximately 10:30 p.m. and 11:30 p.m., beginning at 56 Ingraham Place, Bristol, Connecticut, and ending in the vicinity of Lane Hill Road, Terryville, Connecticut.

"The two informations were consolidated for trial

. . . . The defendant was convicted of the crimes of assault in the first degree, conspiracy to commit assault in the first degree and tampering with physical evidence. The defendant was found not guilty of unlawful restraint in the first degree and conspiracy to commit murder. The jury was unable to reach unanimous verdicts with respect to the charges of murder, felony murder, kidnapping [in the first degree], and conspiracy to commit kidnapping [in the first degree]. The state [then sought] to retry the defendant with respect to the charges for which the jury was unable to return a verdict." The defendant filed a motion to dismiss the murder, felony murder, kidnapping in the first degree, and conspiracy to commit kidnapping in the first degree counts. The court denied the defendant's motion as to the murder, felony murder, and kidnapping counts, denials from which the defendant now appeals. The court granted the defendant's motion as to the conspiracy to commit kidnapping in the first degree count, a decision from which the state now cross appeals. We address the state's cross appeal first and then turn to the defendant's claims.

A

State's Cross Appeal

The state asks us to conclude that the court improperly determined that the charge of conspiracy to commit assault in the first degree, of which the defendant was convicted, and the conspiracy to commit kidnapping in the first degree charge, about which the jury could not reach a unanimous verdict, arose from the same agreement and that a retrial on the latter charge would violate the defendant's double jeopardy protection against a subsequent prosecution for the same offense after conviction. We are not persuaded by the state's argument.

"Some of the factors to consider in the context of whether multiple prosecutions are permitted for multiple conspiracies are the participants, the time period, similarity of the crimes, and the existence of common acts, objectives and a common location. . . . In [*State* v. *Ellison*, 79 Conn. App. 591, 599, 830 A.2d 812, cert. denied, 267 Conn. 901, 838 A.2d 211 (2003)], this court also considered as evidence of multiple agreements that there were separate discussions." (Citation omitted; internal quotation marks omitted.) *State* v. *Brown*, supra, 132 Conn. App. 256.

On appeal, we determine whether the alleged conspiracy to commit kidnapping in the first degree and the alleged conspiracy to commit assault in the first degree arose from the same unlawful agreement, or two separate unlawful agreements. "A single agreement to commit several crimes constitutes one conspiracy. . . . [M]ultiple agreements to commit separate crimes constitute multiple conspiracies." (Internal quotation

marks omitted.) *State* v. *Ellison*, supra, 79 Conn. App. 599; see also *State* v. *Mendez*, 154 Conn. App. 271, 280, 105 A.3d 917 (2014). We consider several factors in determining whether multiple prosecutions are permitted for multiples conspiracies, including: "the participants, the time period, similarity of the crimes, and the existence of common acts, objectives and a common location." *State* v. *Ellison*, supra, 599 (listing factors court considered in *United States* v. *Korfant*, 771 F.2d 660, 662 [2d Cir. 1985]).

The state argues that the charge of conspiracy to commit kidnapping in the first degree and the charge of conspiracy to commit assault in the first degree refer to separate conspiracies because (1) they were charged in separate informations, (2) they involved separate sets of participants, (3) there was no overlap in time between the two conspiracies, (4) the two conspiracies operated differently, (5) they consisted of distinct overt acts, (6) they occurred at different locations, (7) they had different criminal objectives, and (8) they were independent of one another. We disagree.

As an initial matter, we note that, although the state now argues that the two conspiracies were charged in separate informations, it previously had represented at a hearing in the trial court that the operative facts implicated by each information "were all the same." The state explained, "[i]t's the same victim, same sequence of events that happened." Moreover, the state argued that it had filed separate informations solely because the events started in one jurisdiction and concluded in another. That these charges were brought in separate, simultaneously issued informations on the basis of asserted jurisdictional requirements undermines the state's position on appeal.

The court found that, in the circumstances of this case, there was a single, continuous agreement. This finding is not clearly erroneous. The first information stated that the assault conspiracy involved the defendant, Dennis Guerrera, Michael Boilard, and Sarah Boilard, while the second information alleged that the kidnapping conspiracy was an agreement between the defendant, Dennis Guerrera, and Wilcox. The court found that the state's evidence at trial showed that the defendant, Dennis Guerrera, and the Boilards conspired to assault the victim because they believed he had stolen from Michael Boilard. Then, "in furtherance of that conspiracy, the defendant and [Dennis Guerrera] lured [the victim]" to the Boilards' apartment, assaulted him, and then contacted Wilcox to get his help transporting the victim to Buttermilk Falls. According to the trial court, then, Wilcox was added to a conspiracy already in motion, and there was no new, distinct conspiracy.

The state contends that Wilcox did not know about the assault conspiracy, which had been completed by the time he agreed to help the defendant and Dennis

Guerrera. This argument, while supported by the record, simply suggests that this particular conspiracy—an agreement to exact revenge on the victim—was one in which Wilcox was a late addition. Our case law contains no requirement that every member of a conspiracy be present and involved in each step of the overall criminal transaction; indeed, the participants of a conspiracy need not even know one another. For example, in a "hub-and-spokes" association or conspiracy, "a single central figure, the 'hub,' maintains separate relationships with two or more confederates, the 'spokes,' who, although they all engage with the hub in common criminal activities in furtherance of a common purpose, deal only with the hub, but not with each other." *State* v. *Bush*, 156 Conn. App. 256, 267, 112 A.3d 834, cert. granted on other grounds, 317 Conn. 903, 114 A.3d 1219 (2015).

The state's arguments that there were two agreements because of the differing times, locations, and participants involved in the assault and the kidnapping do not persuade us that the court's factual conclusion that there was a single continuing conspiracy, at least between the defendant and Dennis Guerrera, is clearly erroneous. The court applied accepted principles of law. We agree with the court that the state's argument is "merely an effort to segment into pieces one unbroken agreement" to assault the victim. Accordingly, the state's claim fails.

### B

### Defendant's Appeal

The defendant claims that the court incorrectly denied his motion to dismiss the charges of murder, kidnapping in the first degree, and felony murder because the state is collaterally estopped, under the double jeopardy clause, from pursuing a conviction on those charges. We do not agree.

In our determination of whether these claims are barred by collateral estoppel, we note that the defendant bears the burden of "establishing that the issue he seeks to foreclose from consideration in the second case was necessarily resolved in his favor in the prior proceeding. . . . Furthermore, when a defendant is acquitted of conspiracy and then retried on the substantive offense, if it can be determined that the first jury must have determined an ultimate fact common to the conspiracy and substantive crimes in the defendant's favor, acquittal of conspiracy may prevent the government from introducing the evidence necessary to convict the defendant of the substantive offense in a subsequent trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Hope*, 215 Conn. 570, 585, 577 A.2d 1000 (1990), cert. denied, 498 U.S. 1089, 111 S. Ct. 968, 112 L. Ed. 2d 1054 (1991). With these principles in mind, we address each of the defendant's claims in turn

to determine whether the issues that he argues are subject to collateral estoppel were necessarily resolved in his favor at trial.

1

The defendant claims that the court erred when it denied his motion to dismiss the charge of murder as a principal or as an accessory because he previously had been acquitted of the charge of conspiracy to commit murder and, given the pleadings, evidence, and jury instructions, the jury must have found that he lacked the intent to kill the victim. A second prosecution, the defendant argues, would violate the double jeopardy clause.

The defendant relies on a case decided by our Supreme Court, *State* v. *Hope*, supra, 215 Conn. 570. In *Hope*, the defendant was enlisted to participate in a conspiracy to kill the husband of a woman who allegedly had been mistreated by the husband. Id., 573. On the night of the victim's murder, an alleged coconspirator shot the victim, and the defendant allegedly punched the victim repeatedly. After the victim had died, the defendant and the coconspirator allegedly placed the body in the trunk of the victim's car and disposed of other incriminating evidence. Id., 574.

At trial, the defendant in *Hope* testified that he had not been involved in the conspiracy. He admitted that he knew of the murder plot, but claimed that he drove to the couple's residence in an attempt to prevent the murder. He also testified that he was intoxicated that evening. Id., 575. The defendant was acquitted of conspiring to murder the victim. The state then sought to charge the defendant with the substantive crime of murder. The defendant's motion to dismiss, which was based on collateral estoppel, was denied by the trial court. On appeal, our Supreme Court explained that "the seminal question that we must resolve is whether, in the defendant's trial for conspiracy to commit capital felony murder, the jury could have acquitted the defendant, yet still, rationally and reasonably, have found that the defendant possessed the specific intent that [the victim] be murdered." Id., 587. The Supreme Court determined that a subsequent prosecution was barred.

The court in *Hope* reasoned that the jury must have accepted one of three possible scenarios: (1) the defendant went to the house to prevent the murder, and, thus, he lacked the intent to commit murder; (2) he was intoxicated and could not form the requisite intent; or (3) there was no agreement between the defendant and the various coconspirators. Id., 588. The court remarked that "it is difficult to fathom how the jury could have rationally and reasonably concluded that the defendant did not agree with [the coconspirator] 'to engage in or cause the performance' of [the victim's] murder, yet still believed that the defendant drove [the

coconspirator] to the [the victim's] house, walked into [the victim's] bedroom, began to beat [the victim], stopped beating [the victim] while [the coconspirator] shot him, and then started beating [the victim] again until [the coconspirator] told him to stop because [the victim] was dead." Id., 589.

The facts of the present case are distinguishable from those in *Hope*. Here, the record reveals ample evidence on which the jury could have found the defendant not guilty of conspiracy to commit murder because the state did not prove the agreement necessary for a conspiracy to murder; the jury did not necessarily resolve the intent element in the defendant's favor. Without the finding of an agreement, there would not necessarily be a finding of intent, one way or the other. In *Hope*, the evidence of an agreement between the parties was substantial: the victim's wife testified that the defendant had not wanted the coconspirator to kill the victim because he would " 'screw it up' "; id., 572; whereas the defendant believed that he could " 'kill [the victim] with just one blow' "; id.; the coconspirator told the defendant of his plan to drug, strangle, or shoot the victim; on the night of the murder, the defendant picked up the coconspirator and waited with him at a cafe for hours before the coconspirator finally told him he planned to kill the victim and asked if the defendant could help by moving the body; the defendant told a third party that he and the coconspirator were going to the victim's home to kill him; the defendant drove the coconspirator to the victim's home; the victim's wife overheard the defendant and the coconspirator in the victim's bedroom beating the victim and firing a gun several times; the defendant helped hide the body and dispose of other incriminating evidence with the coconspirator. Id., 573–75. In contrast, the evidence of an agreement presented by the state in the present matter is entirely circumstantial and not nearly as salient: witnesses testified that Dennis Guerrera and the defendant walked into the woods with the victim at Buttermilk Falls; and a witness claimed that Dennis Guerrera and the defendant had told him that they took turns beating the victim with a single baseball bat. It is plausible, then, that the jury in the present matter concluded that the state did not establish an agreement to commit murder.

The jury instructions as to the conspiracy to commit murder charge set forth the elements as follows: "(1) the defendant specifically intended that conduct which constituted the crime of murder be performed; (2) the defendant, acting with that criminal intent, entered into an agreement with one or more persons to engage in conduct constituting the crime of murder; and (3) there was an overt act in furtherance of the subject of the agreement by any one of those persons." In view of the pleadings, evidence, and these instructions, we determine that the ultimate fact of the defendant's intent to kill was not *necessarily* resolved by the jury.

We may imagine numerous scenarios, on the basis of the evidence in the record, in which the jury could have found it not proven beyond a reasonable doubt that the defendant agreed with Dennis Guerrera to commit murder, while still reasonably finding that the defendant had the requisite intent to kill the victim. For instance, the jury could have found that the defendant had the intent to commit murder without necessarily having agreed with his brother to do so. The defendant and Dennis Guerrera perhaps agreed to assault the victim at Buttermilk Falls, and at some point during the assault, the defendant individually developed an intent to kill the victim. To create an exhaustive list would require rampant speculation—a fact that, in itself, thwarts the defendant's argument that the jury *necessarily* resolved the issue of intent in the defendant's favor.

The defendant argues that "[t]wo people together beating a single person to death, both with an intent to kill, have committed a conspiracy, as a matter of law," or, have engaged in an "ipso facto" conspiracy. (Emphasis omitted.) In fact, he contends, he could not have had the intent to kill the victim and carried out the murder absent an agreement with Dennis Guerrera to do so. The evidence as to intent,[10] however, was far more extensive than the state's evidence of an agreement. The jury certainly could have inferred the existence of an agreement on the basis of the testimony at trial, but "it is not enough that the fact may have been determined in the former trial"; the defendant must prove that the fact actually was decided. (Emphasis omitted; internal quotation marks omitted.) *State* v. *Aparo*, supra, 223 Conn. 406. The jury may simply have decided that the state did not prove that the defendant entered into an agreement or mutual plan with Dennis Guerrera, regardless of whether he had the intent to commit murder. Therefore, the defendant's claim fails.

2

The defendant claims that the court improperly denied his motion to dismiss the first degree kidnapping count because, in acquitting him of unlawful restraint, the jury necessarily determined that the defendant did not restrain the victim. The state is therefore collaterally estopped from retrying him on the kidnapping charge. We do not agree.

The defendant argues that the restraints alleged in the kidnapping charge and in the unlawful restraint charge are the same, single restraint; hence, the jury's finding of not guilty of an unlawful restraint collaterally estops the state from retrying the kidnapping charge, on the basis of the same unlawful restraint, in a new trial. In the first information, the state charged the defendant with "unlawful restraint in the first degree . . . on or about February 22, 2011, at approximately 10:30 p.m., in or around 56 Ingraham Place, Bristol

. . . ." The second information charged the defendant with kidnapping the victim "between approximately 10:30 p.m. and 11:30 p.m., beginning at 56 Ingraham Place, Bristol . . . and ending in the vicinity of Lane Hill Road, Terryville . . . ." The court found that the evidence presented at trial established that the unlawful restraints alleged in each of the informations did not necessarily refer to a continuous restraint, but rather two separate criminal acts. This finding is not clearly erroneous.

The second information's allegation of kidnapping in the first degree clearly is distinct from the unlawful restraint alleged in the first information. The kidnapping may have begun at the same general time and in the same general location as the alleged unlawful restraint, but the kidnapping is described as concluding in a location different from the unlawful restraint. There is no indication from the informations that the first unlawful restraint necessarily transitioned into a full-fledged kidnapping, as the defendant contends, and the evidence adduced at trial supported the existence of two distinct criminal transactions. The evidence to support the unlawful restraint described in the first information was limited. The state's theory at trial was that the victim was incapacitated by the physical trauma he suffered from the assault; these serious injuries prevented the victim from leaving the Boilards' apartment. Testimony from various witnesses established that (1) the victim willingly went to the Boilards' apartment after receiving a telephone call from the defendant, and (2) a neighbor heard fighting and someone shouting, "[d]ude, please stop," emanating from within the apartment after the victim entered.

By contrast, the kidnapping charge finds stronger support in the record. Various witnesses testified that the defendant and the victim left the apartment together. The defendant was seen carrying an aluminum bat as he and the victim walked to Fast Freddies where Dennis Guerrera and Wilcox picked them up. Inside the car, the victim asked to be taken to a hospital, but the defendant insisted that the victim "be quiet." Upon arriving at Buttermilk Falls, the defendant—who was still carrying the baseball bat—and Dennis Guerrera walked with the victim into the woods. The defendant later allegedly told Michael Boilard that the victim "begged for them to let him go."

The court described the evidence offered at trial to establish the kidnapping related restraint as "substantial" in contrast to the minimal evidence offered to prove the restraint within the apartment, "hence the not guilty verdict on [that] charge of unlawful restraint." The court noted that "[t]he contrasting evidence between the two counts reveals that the jury reasonably could have concluded that the two counts implicated two distinct criminal transactions."

Viewing the entire record in this case; see *State* v. *Aparo*, supra, 223 Conn. 390; in a practical and rational manner, it is clear that the defendant has not met his burden of proving that the only logical interpretation of the acquittal on the unlawful restraint charge is that the jury concluded that there was no unlawful restraint at any point on the day of the victim's murder. The defendant relies substantially on the language used in the informations to describe the locations of the two criminal acts, arguing that if no restraint occurred "in or around" the Boilards' apartment, then there is no plausible way for the kidnapping to have begun at the Boilards' apartment as alleged. The defendant also takes issue with the court's determination that "[t]he very existence of two informations belies the defendant's claim that the state was alleging one restraint." Despite these arguments, the testimony presented at trial does not require an inference of one continuous restraint that began with the assault in the apartment, became a kidnapping, and ended at Buttermilk Falls. The jury reasonably could have determined that the defendant was charged with two distinct crimes that did not necessarily overlap. We conclude, then, that the state could assert two separate unlawful restraints. The defendant's claim fails because the jury did not necessarily resolve the unlawful restraint element of the kidnapping charge in the defendant's favor.

3

The defendant finally claims that the state is collaterally estopped from trying him for felony murder because it is collaterally estopped from retrying him on the predicate felony of kidnapping in the first degree. The jury was unable to reach a decision on the charge of felony murder. Because we concluded that the state may retry the predicate offense of kidnapping in the first degree, this argument necessarily fails.

The judgments are affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] In *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court of the United States held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

[2] We note that the defendant expressly stated that he is not claiming that the court abused its discretion by quashing the subpoena; his claim "has always been advanced as solely a *Brady* claim."

[3] Moreover, unlike the State's Attorney's Office in *Demers* that had easy access to police reports even from another jurisdiction, the state in the present matter would have had to secure a search warrant or serve a subpoena to get access to the recordings. Reviewing an " 'easily available' " police report; *Demers* v. *State*, supra, 209 Conn. 153; for exculpatory information is a very different venture from ordering the department to listen to more than one thousand phone calls, none of which have been claimed to contain material that would be useful to the defense.

[4] The defendant specifically "raises this issue alternatively as an evidentiary error or as an error of constitutional magnitude . . . ."

[5] In his brief, the defendant highlights several potentially inculpatory hearsay statements supposedly made by Dennis Guerrera. Sarah Boilard testified that both Dennis Guerrera and the defendant said "they had gotten into a fight, and then they had let [the victim] go home." Wilcox testified to the following: "Dennis was trying to tell me something; he was tapping me on the leg, and I didn't understand what he was saying, but I thought that he was trying to say that they were going to beat [the victim] up"; after beating the victim, Dennis Guerrera called Wilcox, saying, "[we're] done; [we're] on [our] way up"; "[the defendant] and Dennis were saying, how they were beating him up . . . ."

Michael Boilard testified that "[the defendant and Dennis Guerrera] said they both took turns beating [the victim] until he stopped moving." He further testified that Dennis Guerrera "told me what they did to him . . . ." Finally, April Wells testified that Dennis Guerrera told her, "we killed someone."

[6] The actual statement made by Dennis Guerrera was, "[t]hat's why I . . . didn't go to trial and copped out to what . . . I did . . . . It wasn't right what I did, but it . . . happened."

[7] No specific *Crawford* claim, for example, has been made. Cf. *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

[8] We note that at trial, defense counsel impeached the three witnesses' overall credibility by inquiring into agreements they had reached with the state in exchange for their testimony.

[9] We note that in a subsequent federal proceeding, the petition by the defendant in *Aparo* for a writ of habeas corpus was granted. We refer to this case solely for the legal principles it established and not the factual underpinnings upon which the United States District Court relied in granting the writ. See *Aparo* v. *Superior Court*, 956 F. Supp. 118 (D. Conn. 1996), aff'd, Docket No. 96-2591, 1997 WL 656969 (2d Cir. June 18, 1997) (decision without published opinion, 129 F.3d 113 [2d Cir.]), cert. denied, 522 U.S. 967, 118 S. Ct. 414, 139 L. Ed. 2d 317 (1997).

[10] Such evidence included inculpatory statements the defendant made leading up to and after the murder; testimony from a witness who had seen blood on the defendant's hands; the defendant's attempt to remove evidence of the assault from the Boilards' apartment after the murder; and witness testimony that the defendant carried the aluminum baseball bat into the woods shortly before the victim's murder.